Jay A. Tufano, California Bar No. 286574
**RING BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California  92614
Telephone.: (949) 202-5810
Facsimile:   (949) 679-7939
E-Mail:       jtufano@ringbenderlaw.com


Attorneys for Plaintiff
Jim 72 Properties, LLC

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JIM 72 PROPERTIES, LLC, a California limited liability company, | Case No. |
| | Assigned to |
| Plaintiff, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| v. | **(1) RCRA 42 U.S.C. § 6921 et seq. and 40 C.F.R. § 264** |
| MONTGOMERY CLEANERS, an entity of unknown form, dba MONTGOMERY CLEANERS & PRESSERS and MONTGOMERY C H; ROBERT B. JASSO, an Individual; VIOLA JASSO, an Individual; JOHN W. RICH, an Individual; DORIS L. RICH, an Individual; FELIPE P. RENDON, an Individual; RENDON PROPERTIES LLC a California limited liability corporation and DOES 1-100, inclusive, | **(2) NEGLIGENCE** **(3) TRESPASS** **(4) NUISANCE** Complaint Filed: Trial Date: |
| Defendants. | |

1    Plaintiff Jim 72 Properties, LLC in its Complaint against Defendants
2  Montgomery Cleaners dba Montgomery Cleaners and Pressers; Montgomery
3  Cleaners dba Montgomery CH; Robert B. Jasso; Viola Jasso; John W. Rich; Doris
4  L. Rich; Felipe P. Rendon; and Rendon Properties LLC alleges the following:

5                      **JURISDICTION AND VENUE**

6    1.    Plaintiff's Complaint raises a federal question under 42 U.S.C. § 6972
7  (a)(1)(B) of the Resource Conservation and Recovery Act (RCRA).  This Court has
8  subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337.

9    2.    All of Plaintiff's claims for relief contained in this Complaint arise out
10  of the same transaction and occurrence as Plaintiff's RCRA claim. Accordingly, this
11  Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28
12  U.S.C. § 1367.

13    3.    This action arises from RCRA violations and violations of state law
14  that occurred at a facility and property located in the Central District. Venue in the
15  Central District of California is proper under 42 U.S.C. § 6972 (a)(2).

16                              **PARTIES**

17    4.    Plaintiff Jim 72 Properties, LLC is a limited liability company with its
18  principal place of business in Beverly Hills, California.

19    5.    Plaintiff has a valid and lawful assignment of all rights to bring
20  environmental claims in relation to chlorinated solvent and other contamination
21  migrating onto the property located at 1355 North Avalon Boulevard, Wilmington,
22  California. A copy of the assignment agreement is attached hereto as **Exhibit A**.

23    6.    On information and belief, Defendant Montgomery Cleaners, dba
24  Montgomery Cleaners & Pressers and Montgomery CH (collectively "Montgomery
25  Cleaners") had its principal place of business in Wilmington, California.
26  Montgomery Cleaners owned and/or operated a dry cleaning business at 1365 North
27  Avalon Boulevard, Wilmington, California, between 1950 and 2008.

28    7.    Defendant Doris L. Rich is and was at all relevant times a citizen of

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1

California currently residing in Rancho Palos Verdes, California. Doris Rich owned and/or operated Montgomery Cleaners between 1950 and 1978.

8.     Defendant John W. Rich is and at all relevant times was a citizen of California currently residing in La Quinta and/or Rolling Hills, California. John Rich owned and/or operated Montgomery Cleaners between 1950 and 1978.

9.     Defendant Robert B. Jasso is and at all relevant times was a citizen of California residing in Wilmington, California. Robert Jasso owned and/or operated Montgomery Cleaners between 1950 and 2008.

10.    Defendant Viola B. Jasso is and at all relevant times was a citizen of California residing in Wilmington, California. Viola Jasso owned and/or operated Montgomery Cleaners between 1950 and 2008.

11.    Defendant Felipe P. Rendon is and at all relevant times was a citizen of California residing in Wilmington, California. On information and belief, Felipe Rendon owned a dry cleaning business, located at 1365 North Avalon Boulevard, Wilmington, California between 1983 and 2000.

12.    Defendant Rendon Properties, LLC is a limited liability company with its principal place of business in Wilmington, California. On information and belief, Rendon Properties has owned a dry cleaning business, located at 1365 North Avalon Boulevard, Wilmington, California between 2000 to present.

13.    DOES 1-100 are sued under fictitious names. The true names and capacities of DOES 1-100, inclusive, whether individual, corporate associate, or otherwise are unknown to Plaintiff. Plaintiff alleges on information and belief that DOES 1-100 are in some manner responsible for the damages alleged herein. Plaintiff will amend this Complaint to show the true names and capacities of DOE Defendants when they are known.

14.    Hereafter, the parties referenced in Paragraphs five (5) through twelve (12) collectively shall be referred to as "Defendants."

///

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

COMPLAINT

**FACTUAL ALLEGATIONS**

15.     From 1950 through 2008, the property located at 1365 North Avalon Boulevard in Wilmington, California (the "Polluting Site") existed and was operated by one or more Defendants as a dry cleaning business.

16.     On information and belief, since 1950, one or more Defendants owned the real property constituting the Polluting Site, owned the real property and operated the dry cleaning business associated with the Polluting Site, or operated a dry cleaning business on the real property at the Polluting Site.

17.     Between 1950 and 2008, the dry cleaning business at the Polluting Site used various volatile organic compounds (VOCs), including chlorinated solvents and other hazardous chemicals, for the purpose of carrying out dry cleaning operations, including garment cleaning and other services.

18.     In or about June 2013, Plaintiff entered into escrow for the purchase a property located at 1355 North Avalon Boulevard, Wilmington (County of Los Angeles), California (the "Subject Property").

19.     During the escrow process, Plaintiff commissioned the environmental consulting firm Gannett Fleming to conduct an environmental site investigation of the Subject Property. The purpose of this investigation was to investigate subsurface contamination originating from the Polluting Site and to delineate the extent, degree and nature of that contamination on the Subject Site. Gannett Fleming's investigation revealed that substantial chlorinated solvent pollution from the Polluting Site had moved onto and contaminated the adjacent Subject Property.

20.     At the conclusion of its investigation, Gannett Fleming produced a report titled "Phase I and Limited Phase II Environmental Site Assessment Report" dated November 15, 2013 ("ESA Report"). A copy of the ESA Report is attached hereto as **Exhibit B**.

21.     On or about November 15, 2013, Gannett Fleming provided a copy of the ESA Report to Plaintiff Jim 72 Properties, LLC.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

3

22.     Soil samples collected at the Polluting Site and the Subject Site, as reported in the ESA Report, identified detectable concentrations of Tetrachloroethylene ("PCE"), Trichloroethylene ("TCE"), cis-1, 2-dichloroethylene ("cis-1,2-DCE), and other related compounds (collectively "Pollutants" or the "Pollution") originating at and from the Polluting Site. The pattern of Pollution detected during the investigation indicated to Gannett Fleming that the Polluting Site is the source of that Pollution.

23.     The Subject Site is situated immediately adjacent to and downgradient, for groundwater movement purposes, of the Polluting Site. On information and belief, the Pollution originated at the Polluting Site and has migrated through the groundwater and/or soil onto the Subject Property.

24.     The concentrations of Pollutants at the Polluting Site and the Subject Site exceed regulatory screening levels for residential and commercial uses of the properties. As a result, the Polluting Site and the Subject Site require environmental remediation to protect the environment and public health.

25.     Defendants have done nothing to remediate the Pollutants on the Polluting Site or the Subject Property or to halt their migration onto the Subject Property. On information and belief, the estimated cost of investigation, monitoring, and remediating soil and groundwater contamination and Pollution to applicable regulatory standards could exceed $550,000.

26.     On January 9, 2015, the owners of the Subject Property, Amulfo and Rosa Estrada, assigned Plaintiff the right to pursue claims against the owners and operators of the Polluting Site in relation to the Pollution discovered at the Subject Property, as set forth in **Exhibit A**.

///

///

///

///

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

COMPLAINT

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

**COUNT I**

**DAMAGE CLAIM PURSUANT TO**

**42 U.S.C. §§ 6921 ET SEQ. AND 40 C.F.R. § 264**

**(RCRA)**

27.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 26 as if fully set forth herein.

28.    Defendants are or were owners and/or operators of the Polluting Site between 1950 and present.

29.    Certain Defendants installed, owned and/or operated subsurface utilities and dry cleaning equipment at the Polluting Site. Such equipment was also used by subsequent owners and/or operators for dry cleaning operations, which involved the use of VOCs, Pollutants and other hazardous wastes.

30.    The Polluting Site is a treatment, storage and/or disposal facility, as defined by RCRA and its implementing regulations.

31.    On information and belief, Defendants stored RCRA-regulated hazardous substances and wastes – including those containing VOCs – in various locations of the Polluted Site, including but not limited to dry cleaning machines, subsurface waste-storage receptacles, holding basins, drums, surface troughs, and pipes.

32.    Defendants disposed of or facilitated disposal of hazardous substances and wastes at the Polluting Site. On information and belief, RCRA-regulated hazardous substances and wastes at various times leaked, were spilled, and/or were released from dry cleaning equipment, conveyance equipment, and storage vessels. Consequently, hazardous substances and wastes, including Pollutants, were discharged and disposed of into the soil and groundwater beneath the Polluting Site.

33.    The leaks of hazardous substances and wastes, including Pollutants, emanating from Defendants' dry cleaning equipment and storage vessels continue to present an imminent and substantial endangerment to public health and the

1  environment. Indeed, following the leaking and disposal of the hazardous substances
2  and wastes into the soil and groundwater, such Pollutants and other VOCs have
3  migrated into the soil and groundwater of the Subject Property and Defendants have
4  done nothing to remediate the Pollutants or halt their migration onto the Subject
5  Property.

6      34.   In storing and facilitating storage and disposing of and facilitating
7  disposal of hazardous substances and wastes, Defendants have violated various
8  regulations governing the treatment, monitoring, permitting, managing and
9  disposing of liquid and solid wastes. Defendants' violations include but are not
10 limited to the following statutory and regulatory provisions:  42 U.S.C. § 6921 *et*
11 *seq.*; 40 C.F.R. §§ 262 Subpart B (manifesting wastes); Subpart C (pre-transport
12 requirements); Subpart D (recordkeeping and reporting requirements); 264.1 *et seq.*
13 (standards for owners and operators of hazardous waste treatment, storage and
14 disposal facilities); and 265.1 *et seq.* (standards for owners and operators of interim
15 status hazardous waste treatment, storage and disposal facilities).

16     35.   Defendants are jointly and severally liable for releases and disposal of
17 hazardous substances and wastes, in addition to permitting, monitoring, treatment,
18 and management violations.

19     36.   On information and belief, Defendants are each liable for their
20 company's, predecessors', and/or subsidiaries' liabilities by means of one or all of
21 the following legal mechanisms: (1) name change; (2) statutory merger; (3) de facto
22 merger; (4) express and/or implied assumption of liability; (5) alter ego liability; (6)
23 control of decision making of a subsidiary or sister entity; and/or (7) by fraudulently
24 entering transactions to specifically avoid a subsidiary or sister entity's liabilities.

25     37.   Plaintiff Jim 72 Properties, LLC properly and timely gave notice of the
26 violations alleged herein to Defendants more than 60 days prior to the filing of this
27 action, as required by 42 U.S.C. 6972(b)(1)(A).

28     38.   In light of the foregoing, Plaintiff is entitled to injunctive relief

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

requiring Defendants to take all remedial and other actions necessary to abate and remove the Pollutants that are contaminating the soil and/or groundwater of the Subject Property.

## COUNT II
## NEGLIGENCE

39.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 38 as if fully set forth herein.

40.     Defendants had a duty to use due care in the handling, control, disposal, release, remediation, and use of hazardous substances at the Polluting Property.

41.     Defendants knew or should have known that their activities could result in spills, leaks, discharges, and releases of hazardous substances and wastes, including Pollutants, into the soil and groundwater water of the Polluting Site. Defendants knew or should have known that such spills, leaks, discharges, and releases could or would cause Pollutants to migrate to other properties, including the Subject Property.

42.     Defendants, and each of them, negligently handled, controlled, failed to control, disposed, and released, hazardous substances and products containing hazardous substances.

43.     Defendants negligently failed to: (1) prevent spills, leaks, discharges, and releases of Pollutants through the use of appropriate technology; (2) install and maintain systems to prevent spills, leaks, discharges, and releases; (3) monitor and facilitate prompt discovery of spills, leaks, discharges, and releases; (4) warn those who may be injured as a result of spills, leaks, discharges, and releases; and (5) clean up, contain, remediate and abate spills, leaks, discharges and releases to prevent harm and injury to Plaintiff and others, including owners of the Subject Property.

44.     Defendants' negligent conduct has caused spills, leaks, discharges, and

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

releases of Pollutants, which have migrated into the soil and/or groundwater of the Subject Property.

45.     In or about 2013, Plaintiff commissioned an investigation in relation to a potential sale of the Subject Property. As a result of that investigation, Plaintiff learned of Pollution in the soil and/or groundwater of the Subject Property upon receiving the ESA Report after it was issued on November 15, 2013, as described in **Exhibit B**.

46.     As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff and the owner of the Subject Property have incurred and will continue to incur investigation, remediation, and treatment costs required to address the soil and groundwater Pollution at the Subject Property. On information and belief, the estimated cost of investigation, monitoring, and remediating of soil and groundwater contamination and Pollution could exceed $550,000.

47.     The owner of the subject property also has suffered damages in the loss of value in the Subject Property in the amount to be proven at trial.

48.     Plaintiff is entitled to injunctive relief requiring Defendants to take all remedial and other actions necessary to abate and remove the Pollutants that are contaminating the soil and/or groundwater of the Subject Property.

49.     Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

**COUNT III**

**TRESPASS**

50.     Plaintiff realleges paragraphs 1 through 49, inclusive, of this complaint and incorporates them herein by reference.

51.     Plaintiff, as assignee of the Subject Property's owners, is and at all times relevant to this action was the owner and actual possessor of the Subject Property for purposes of this litigation.  Plaintiff's assignors have owned the Subject Property since 1983.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

COMPLAINT

52.   Between 1950 and present day, Defendants without the consent and authority and against the will of Plaintiff, entered the Subject Property as follows: Defendants, and each of them, have negligently handled, controlled, failed to control, disposed, and released, hazardous substances and products containing hazardous substances in relation to dry cleaning operations. Defendants' conduct caused spills, leaks, discharges, and releases of VOC's. Such Pollutants have migrated from the soil and/or groundwater of the Polluting Property to the Subject Property.

53.   In or about 2013, Plaintiff commissioned an investigation in relation to a potential sale of the Subject Property. As a result of that investigation, Plaintiff discovered Pollution at the Subject Property, as described in **Exhibit B**. On information and belief, the Pollutants remain in the soil and/or groundwater of the Subject Property.

54.   Defendants, and each of them, caused, created, and assisted in the creation of the Pollution giving rise to the trespass alleged herein.

55.   As a direct and proximate result of Defendants' acts and omissions, Plaintiff and the owner of the Subject Site have incurred and will continue to incur investigation, remediation, and treatment costs required to address the soil and/or groundwater Pollution at the Subject Property. On information and belief, the estimated cost of investigation, monitoring, and remediating soil and groundwater contamination and Pollution could exceed $550,000.

56.   The owner of the Subject Property also has suffered damages in the loss of value to the Subject Property in the amount to be proven at trial.

57.   Plaintiff is entitled to injunctive relief to abate the nuisance and take all remedial and other actions necessary to abate and remove the Pollutants that are contaminating the soil and/or groundwater of the Subject Property.

58.   Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

COMPLAINT

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

## COUNT IV

## NUISANCE

59.   Plaintiff realleges paragraphs 1 through 58, inclusive, of this complaint and incorporates them herein by reference.

60.   Plaintiff, as assignee of the Subject Property owners' environmental claims, is and at all times relevant to this action was the owner and actual possessor of the Subject Property for purposes of this litigation. Plaintiff's assignors have owned the Subject Property since 1983.

61.   Between 1950 and present, Defendants owned and/or operated a dry cleaning operation at the Polluting Property. Defendants used and continue to use chemicals, including those containing Pollutants, for dry cleaning purposes.

62.   The Defendants, and each of them, have negligently handled, controlled, failed to control, disposed, and released, hazardous substances and products as a result of dry cleaning activities. Defendants' negligent conduct caused spills, leaks, discharges, and releases of Pollutants.

63.   The negligent activity of the Defendants, and each of them, as alleged herein, has resulted in the migration of Pollutants from the soil and/or groundwater of the Polluting Site to the Subject Property.

64.   The migration of Defendants' Pollution is injurious to Plaintiff's health, obstructs the free use of Plaintiff's property, and has interfered with Plaintiff's use and enjoyment of the Subject Property.

65.   Plaintiff has not consented to Defendants' negligent releases and/or migration of Pollutants onto the Subject Property. Defendants, and each of them, knew or should have known, that Plaintiff would not consent to this nuisance.

66.   The Defendants, and each of them, caused, created, and assisted in the creation of the Pollution giving rise to the nuisance alleged herein.

67.   As a direct and proximate result of Defendants' acts and omissions, Plaintiff and the owner of the Subject Site have incurred and will continue to incur

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

investigation, remediation, and treatment costs required to address the soil and/or groundwater Pollution at the Subject Property. On information and belief, the estimated cost of investigation, monitoring, and remediating soil and groundwater contamination and Pollution could exceed $550,000.

68.     The owner of the Subject Site also has suffered damages in the loss of value to the Subject Property in an amount to be proven at trial. Unless the nuisance created by Defendants is abated, the owner's property will continue to diminish in value.

69.     Plaintiff is entitled to injunctive relief to abate the nuisance and take all remedial and other actions necessary to abate and remove the Pollutants that are contaminating the soil and/or groundwater of the Subject Property.

## PRAYER

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

70.     An Order declaring that Defendants are liable for the full cost of all remedial and other actions necessary to abate and remove the Pollutants which are contaminating the soil and/or groundwater of the Subject Property;

71.     An Order declaring that Defendants' negligent handling, control, failure to control, disposal, and releases of hazardous substances and products as a result of dry cleaning activities constitutes a nuisance;

72.     An injunction requiring Defendants to take all remedial and other actions necessary to abate and remove the Pollutants which are contaminating the soil and/or groundwater of the Subject Property;

73.     An Order requiring Defendants to abate the nuisance;

74.     Compensatory damages, according to proof, on Plaintiff's state law claims;

75.     Attorneys' fees to the full extent permitted by law pursuant to 42 U.S.C. 6972 (e);

76.     Costs incurred in prosecuting this action, and prejudgment interest to

1 | the full extent permitted by law; and

2 |      77.    For such and other relief as the court may deem just and proper.

3 | Dated:  September 23, 2015

4 |      **RING BENDER LLLP**

5 |      Jay A. Tufano

7 |      By:  */s/ Jay A. Tufano*

8 |      Jay A. Tufano
Attorneys for Plaintiff

9 | Jim Properties 72, LLC

**RING BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

# EXHIBIT A

## ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "Agreement") is made and entered into as of this 9th day of January, 2015, by and between Arnulfo Estrada and Rosa Estrada (collectively, "Assignor") on the one hand and Jim 72 Properties, LLC ("Assignee"), on the other hand with regard to the following facts:

### RECITALS

A.      Assignor is the owner of that certain real property located at 1355 N. Avalon Boulevard, Wilmington, California (the "1355 Property").

B.      On or about May 24, 2013, Assignor and Assignee entered into a Commercial Property Purchase Agreement and Joint Escrow Instruction (the "Purchase Agreement") pursuant to the terms of which Assignor agreed to sell and Assignee agreed to purchase the 1355 Property. The Purchase Agreement has been amended from time to time by the mutual agreement of the parties and, subject to those amendments, is currently in full force and effect.

C.      The property located at 1363-1367 Avalon Boulevard, Wilmington, California (the "1363 Property") is located immediately adjacent to the 1355 Property.  Environmental testing both at the 1355 Property and the 1363 Property has disclosed the existence of vapor phase perchloroethylene ("PCE") and its degradation products (the "PCE Contamination") at both the 1355 Property and the 1363 Property in concentrations greater than the California Human Health Screening Levels ("CHHSL").  The contamination on both properties appears to be the result of the operation of a dry cleaning facility at the 1363 Property.

D.      To ensure the full force and effect of the Purchase Agreement Assignor is willing to assign their rights to Assignee so that Assignee may pursue such an adjudication and Assignee is willing to accept such assignment.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, it is agreed as follows:

1.      Assignor hereby assigns and transfers to Assignee all of their right, title and interest in any claims or cause of actions, Assignor may have against the owner or any previous owners of the 1363 Property relating to the PCE Contamination.  In connection with such assignment, Assignee hereby assigns to Assignor any and all rights to bring a complaint or pursue a claim relating to the property located at 1355 North Avalon Boulevard in Wilmington, California ("Subject Property") for equitable indemnity, contribution, negligence, trespass, nuisance, liability under Comprehensive Environmental Response Compensation and Liability Act of 1980 ( "CERCLA") 42 U.S.C. § 9601 et seq., Resource Conservation and Recovery Act of 1976( "RCRA") 42 U.S.C. § 6903, the California Hazardous Substance Account Act (Health & Safety Code §25300 et seq.), Hazardous Waste Control Law (Health & Safety Code §25100 et seq.), California Water Code (Dickey Act (Water Code §13010, et seq., repealed 1969) and Porter-Cologne Act (Water Code § 13020, et seq.), and/or any other legal claim (collectively,

- 1 -

"Assigned Claims"), against any person and/or entity responsible under these causes of action for the presence of soil, vapor and/or groundwater contamination on and beneath the Subject Property, and on or beneath any adjacent property which have impacted the Subject Property, to recover past, present, and/or future costs incurred by Assignor relating to investigation and/or remediation of the contamination, an injunction to require responsible parties to investigate and remediate the contamination, and/or to obtain compensation for diminution in value for the 1355 Property.

2.      Assignee may sue or bring any claim hereunder under its own name and Assignor shall execute and deliver at the request of Assignee all such further assignments and other documents, instruments and assurances with respect to this assignment as Assignee shall from time to time require in order to effectuate the purposes of this Agreement.

3.      Assignee is hereby authorized and empowered by Assignor to settle, adjust or compromise any and all claims assigned hereunder.

4.      Nothing contained herein shall obligate Assignee to take any action with regard to the claims assigned hereunder or pursue any remedy, claim, cause of action in connection therewith.

5.      The term of this Assignment shall commence on the date of execution hereof and shall continue so long as Assignee shall purchase the 1355 Property or continue to have the right to purchase the 1355 Property pursuant to the Purchase Agreement as amended and shall only terminate, in the event that Assignee elects not to purchase the 1355 Property or its rights under the Purchase Agreement, as amended, terminate.

6.      In the event that Assignee shall purchase the 1355 Property, this assignment shall become absolute, and all proceeds of any settlement, judgment or other resolution will belong solely to Assignee and Assignor shall receive no credit therefore.  IN THE EVENT THAT ASSIGNEE SHALL ELECT NOT TO PURCHASE THE 1355 PROPERTY, ASSIGNOR SHALL HAVE THE OPTION OF (1) INSTRUCTING ASSIGNEE TO DISMISS ANY LAWSUIT FILED BY ASSIGNEE PURSUANT TO THIS AGREEMENT (IN WHICH CASE, ASSIGNEE SHALL IMMEDIATELY DISMISS ANY SUCH LAWSUIT WITHOUT PREJUDICE) OR (2) CONTINUING THE LAWSUIT.

IN THE EVENT ASSIGNEE IS INSTRUCTED TO DISMISS THE LAWSUIT, ASSIGNOR SHALL INCUR NO COSTS OR EXPENSES WHATSOEVER RELATING TO THE LAWSUIT AND ASSIGNEE SHALL BEAR ALL SUCH COSTS AND EXPENSES.

IN THE EVENT ASSIGNOR SHALL ELECT, IN ITS SOLE AND ABSOLUTE DISCRETION, TO CONTINUE THE LAWSUIT, ASSIGNOR MAY DO SO AT ITS OWN EXPENSE AND SHALL, EXCEPT AS HEREINAFTER PROVIDED, HAVE NO OBLIGATION TO REIMBURSE ASSIGNEE FOR ANY EXPENSES OR LEGAL FEES INCURRED BY ASSIGNEE AND ASSIGNOR SHALL RETAIN ALL PROCEEDS OF ANY SETTLEMENT, JUDGMENT OR OTHER RESOLUTION.

-2-

7.      In the event that Assignee shall elect not to proceed with the purchase of the 1355 Property or its right to purchase the same shall terminate pursuant to the terms of the Purchase Agreement as amended, Assignee shall have no further right or obligation to pursue any claim made pursuant to this Agreement.

8.      General Provisions.  This Agreement contains the entire agreement between the parties.  The parties hereto agree to promptly execute and deliver such documents and promptly to do such other acts as are necessary or appropriate to effectuate the purposes of this Agreement.  This Agreement shall not be changed orally; and no waiver or modification hereof shall be valid unless executed in writing.  Waiver of the breach of any term or condition of this Agreement shall not be deemed a waiver of any other or subsequent breach, whether of like or a different nature.  In the event of litigation between the parties hereto related to this Agreement, the prevailing party shall be entitled to recover its attorneys' fees.  This Agreement shall be construed under the laws of the State of California applicable to contracts made and to be performed in that State.  Nothing herein contained shall be construed to create a joint venture or partnership.  Except as otherwise expressly provided herein, each party shall bear his own costs and expenses.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.  This Agreement shall be binding upon and inure to the benefit of the successors, assignees, transferees and devisees of the parties hereto.  The provisions of this Agreement shall survive any closing and not be merged therein.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in Los Angeles, California as of the date first above written.

Assignor:                                          Assignee:

Anulfo Estrada                                     JIM 72 PROPERTIES, LLC
                                                   A California limited liability company

Rosa Estrada                                       By_____
                                                      Jimone Berookhim, Manager

- 3 -

# EXHIBIT B



# PHASE I AND LIMITED PHASE II
# ENVIRONMENTAL SITE ASSESSMENT REPORT



**1355, 1363, & 1367 NORTH AVALON BOULEVARD**
**WILMINGTON, CALIFORNIA**

Submitted to:                **SJB PROPERTIES, LLC**

12301 Wilshire Blvd #297
Los Angeles, CA 90025

Submitted by:



*Excellence Delivered As Promised*

**November 15, 2013**

**PHASE I AND LIMITED PHASE II ENVIRONMENTAL SITE ASSESSMENT REPORT**
**1355, 1363, & 1367 NORTH AVALON BOULEVARD**
**WILMINGTON, CALIFORNIA**
_____

**PROJECT NUMBER**
**057983**
**November 15, 2013**
**Prepared for:**
SJB Properties, LLC

_____

We declare that, to the best of our professional knowledge and belief, we meet the definition of Environmental Professional(s) as defined in §312.10 of 40 CFR 312. We have the specific qualifications based on education, training, and experience to assess a property of the nature, history, and setting of the Subject Property. We have developed and performed the "all appropriate inquiries" (AAI) in conformance with the standards and practices set forth in 40 CFR 312.

**Gannett Fleming, Inc.**

**DRAFT**

Michael Crews, PG, CHg
Senior Project Geologist

**DRAFT**

Leo Rebele
Vice President

Report Prepared by:

**DRAFT**

Ryan Kelleher
Environmental Scientist



## EXECUTIVE SUMMARY

Gannett Fleming, Inc., (Gannett Fleming) was retained by SJB Properties, LLC (SJB) to conduct a Phase I Environmental Site Assessment (ESA) for the properties located at 1355, 1363, and 1367 North Avalon Boulevard in Wilmington, California (the Site, Figure 1). The Site is approximately 1.14 acres in size and consists of three parcels (parcel identification numbers 7420-007-035, 7420-007-036, and 7420-007-040) (Figure 2).  The 1355 address is currently owned by Amulfo & Rosa Estrada and is occupied by a 55,761 square foot warehouse/ and two-story office building.  The properties located at 1363 and 1367 North Avalon Boulevard are respectively occupied by a 2,400 square foot single-story building and a 5,500 square foot single-story building.

The Phase I ESA was conducted in accordance with the American Society of Testing and Materials (ASTM) Designation E 1527-05 and 40 Code of Federal Regulations (CFR) Part 312 *et seq.* (the All Appropriate Inquiries Rule).  Any exceptions to, or deletions from, this practice are described in Sections 1.3 and 5.1 of this Phase I ESA report.  In addition, Gannett Fleming performed a Phase II subsurface investigation at the Site.

The Site was originally used for residential purposes as early as 1928 until approximately 1950, when construction of the commercial structures at the Site commenced. According to a previous environmental report, a former dry cleaner operated at the 1367 building address as early as 1950.  An interview with representatives of the owner of the 1355 North Avalon Boulevard property indicated that operation of the dry cleaner ceased in 2008.   The 1363 property was previously occupied by Farmers Insurance Group from approximately 1950 to 1980, and La Perla Bakery from approximately 1980 to present (although at the time of the Site reconnaissance the structure appeared to be vacant).  The structure located at 1355 North Avalon Boulevard was formerly occupied by Safeway Super Market as early as 1955; Pic N' Save (grocery market) from approximately 1975 to 1985; Acapulco Market from approximately 1985 to 2008; and One-Stop Discount Mart from approximately 2008 to 2012.  The structure at the 1355 property was observed to be vacant at the time of the site reconnaissance.

Rear storage yards were observed  adjacent and to the south of the 1355 structure and west of the 1363/1367 suites; a single 55-gallon drum was observed in the rear storage yard area adjacent to the 1355 building with the affixed labels indicating that it contains grease produced by the former onsite restaurant.  Gannett Fleming was only permitted access to the interior of the former One-Stop Discount Market structure at 1355 - the other structures were not accessible for inspection at the time of the Site visit.  The 1355 building was observed to be in generally poor condition, with portions of the ceiling collapsed as well as broken windows.   A wastewater treatment system was observed in a separate room in the northwest portion of the building.  The building also featured a former restaurant space in the northeast portion of the building with a kitchen area featuring sinks and several small floor drains.  An additional 55-gallon drum was observed in the interior of the 1355 building near the northern entrance; labels did not legibly indicate the contents of the drum.  Three pole-mounted electric transformers were observed in the southwest corner of the property.



On October 24, 2013, Gannett Fleming conducted a Phase II subsurface investigation to test for VOCs in soil vapor consisting of 10 borings (Figure 3).  The purpose of the Phase II ESA was to further delineate the shallow PCE soil vapor impacts identified during the previous investigations at the Site associated with the former onsite dry cleaner facility.  Results of the investigation indicate soil vapor at the Site is impacted with PCE at concentrations exceeding California Human Health Screening Levels (CHHSLs; OEHHA 2010) under both residential and commercial land use scenarios. The highest PCE soil vapor concentrations were detected in the northern portion of the 1355 property, indicating that the adjacent former dry cleaner suite is the likely source of the vapor impacts at the Site.  Further lateral and vertical delineation of the PCE impacts in soil and groundwater is warranted.

**FINDINGS, OPINIONS AND CONCLUSIONS**

**RECs**

Based on our review of available local, state, and federal environmental records, personal interviews conducted with knowledgeable parties, and a site reconnaissance, this assessment has revealed no evidence of recognized environmental conditions in connection with the Site, except for the following:

- The previous Phase II site investigation conducted by SCS Engineers in January 2013 as well as the Phase II ESA conducted at the Site by Gannett Fleming in October 2013 demonstrate that soil vapor beneath the Site is impacted by PCE at concentrations that exceed regulatory screening levels for residential and commercial land use scenarios.  The highest PCE soil vapor concentrations were detected in the northern portion of the 1355 property, indicating that the adjacent former dry cleaner suite is the likely source of the vapor impacts at the Site.  Further lateral and vertical delineation of PCE impacts in soil and groundwater is warranted.

**HRECs**

This assessment has revealed no evidence of HRECs in connection with the Site.

**_De Minimis_ Conditions**

This assessment has revealed no evidence of _de minimis_ conditions in connection with the Site, except for the following:

- Gannett Fleming observed three pole-mounted transformers located at the southern boundary of the Site.  The transformers appeared to be in good condition and no staining or leaking was observed beneath or around the transformers.  The transformers are unlikely to represent an environmental concern to the Site.  In the event that PCB-containing oil leaks from the transformers, the responsibility for cleanup would rest with the utility provider (Los Angeles Department of Water and Power), not the property owner.

- A 55-gallon drum of unidentified contents was observed within the interior of the 1355 building.



No staining or evidence of spillage of hazardous materials was observed in connection with the drum.  Nevertheless, the drum contents should be identified or the drum removed/disposed as a precautionary measure.

**Non-ASTM Conditions**

Gannett Fleming has identified the following non-ASTM environmental issues in connection with the Site:

- Based on the dates of construction, Gannett Fleming opines that ACM may be present at on-site structures.  Therefore, Gannett Fleming recommends performing a pre-demolition asbestos survey prior to any activities with the potential to disturb the materials, and recommends abating any identified ACM in accordance with all applicable laws.  Based on the dates of construction, it is possible that LBP may be present within interior and exterior painted surfaces.  Gannett Fleming recommends testing and handling these surfaces according to applicable laws and regulations, including guidelines of the Occupational Safety and Health Administration ("OSHA").

- Fluorescent light fixtures were observed at the 1355 North Avalon Boulevard property.  Based on the age of construction of the structures, there is the potential that the fluorescent light fixtures contain PCB-containing ballasts.  The fluorescent light fixtures observed appeared to be in generally good condition and Gannett Fleming does not consider the presence of fluorescent light fixtures at the Site an environmental concern.  In the event that PCBs are identified to be present within such fixtures, such fixtures should be disposed of by a licensed hazardous waste hauler.

- Methane was not detected in soil vapor samples collected by SCS during the prior soil vapor investigation conducted in January 2013; however, since the property is located within a Methane Hazard Zone designated by the City of Los Angeles, it is subject to the requirements of the City's Methane Ordinance.  Accordingly, the SJB Properties should ensure compliance with the Ordinance to include appropriate methane mitigation measures required in the construction specifications.



# Table of Contents

1.0 INTRODUCTION ................................................................................................1

   1.1 Purpose .......................................................................................................1

   1.2 Detailed Scope of Services .........................................................................1

   1.3 Limitations and Exceptions ........................................................................2

   1.4 Qualifications .............................................................................................3

   1.5 User Disclaimer ..........................................................................................3

2.0 SITE DESCRIPTION ...........................................................................................4

   2.1 Location ......................................................................................................4

   2.2 Site and Vicinity General Characteristics ...................................................4

   2.3 Current Uses of the Adjoining Properties ..................................................4

   2.4 Physical Setting Sources ............................................................................4

      2.4.1 Topographic Map .............................................................................5

      2.4.2 Soil Survey .......................................................................................5

      2.4.3 Geology and Hydrogeology .............................................................5

      2.4.4 Well Information ..............................................................................5

3.0 USER PROVIDED INFORMATION .....................................................................6

   3.1 Environmental Liens or Activity and Use Limitations ................................6

   3.2 Specialized Knowledge ..............................................................................6

   3.3 Valuation Reduction for Environmental Issues ..........................................6

   3.4 Owner, Property Manager, and Occupant Information ..............................6

   3.5 Reason for Performing Phase I ESA ............................................................7

4.0 ENVIRONMENTAL AND HISTORICAL RECORDS REVIEW .................................8

   4.1 Standard and Additional Environmental Record Sources ..........................8

      4.1.1 Site ..................................................................................................8

      4.1.2 Off-Site ............................................................................................8

4.2 Historical Use Information on the Subject and Adjoining Properties ................................. 11

4.2.1 Historical Sanborn™ Fire Insurance Maps .................................................................. 12

4.2.2 Aerial Photographs ......................................................................................................... 12

4.2.3 Historical Topographic Map Review ........................................................................... 13

4.2.4 City Directory Abstract .................................................................................................. 15

4.2.5 Regulatory Agency Records Review ............................................................................ 19

4.2.6 Previous Environmental Report Summary ................................................................ 21

5.0 SITE RECONNAISSANCE ............................................................................................................ 23

5.1 Methodology and Limiting Conditions ................................................................................... 23

5.2 General Site Setting ...................................................................................................................... 23

5.3 Observations .................................................................................................................................. 23

5.3.1 Interior and Exterior Observations ............................................................................. 23

5.3.2 Chemical Usage/Waste Storage ................................................................................... 24

5.3.3 Abandoned or Unidentified Containers ..................................................................... 24

5.3.4 Catch Basins, Pits, Ponds, Lagoons and Drains ........................................................ 25

5.3.5 Dry Wells ........................................................................................................................... 25

5.3.6 Soil Staining ....................................................................................................................... 25

5.3.7 Vegetative Stress .............................................................................................................. 25

5.3.8 Sheens ................................................................................................................................. 25

5.3.9 Soil Disturbance ............................................................................................................... 25

5.3.10 Odors ................................................................................................................................ 25

5.3.11 Underground Storage Tanks (USTs) .......................................................................... 25

5.3.12 Aboveground Storage Tanks (ASTs) .......................................................................... 25

5.3.13 Oil and Gas Wells/Activities ....................................................................................... 26

5.3.14 Polychlorinated Biphenyl (PCB)-Containing Materials ......................................... 26

5.3.15 Monitoring Wells and Soil Borings ............................................................................ 26

5.3.16 Spills/Releases ................................................................................................................. 26

5.3.17 Surface Debris ................................................................................................................. 26

5.3.18 Hydraulic Equipment .................................................................................................... 26

5.3.19 Air Compressor Usage .................................................................................................. 26

5.3.20 Asbestos-Containing Materials (ACMs) ........................................... 26

5.3.21 Waste Disposal ........................................................................... 27

5.3.22 Wastewater Discharges ............................................................... 27

5.3.23 Storm Water Discharges .............................................................. 27

5.3.24 Utilities ...................................................................................... 27

6.0 LIMITED PHASE II ENVIRONMENTAL SITE ASSESSMENT ......................... 28

6.1 Field Activities ................................................................................. 28

6.1.2 Pre-Drilling Activities .................................................................. 28

6.1.3 Soil Vapor Survey ....................................................................... 28

6.2 Analytical Results ............................................................................ 29

7.0 INTERVIEWS ....................................................................................... 30

7.1 Interviews with Property Owner/Occupants ....................................... 30

7.2 Interviews with Knowledgeable Parties ............................................. 30

7.3 Interviews with Regulatory Agency Personnel .................................... 30

8.0 FINDINGS, OPINIONS AND CONCLUSIONS ............................................. 32

8.1 Summary of Findings ........................................................................ 32

8.1.1 Site History ................................................................................ 32

8.1.2 Site Reconnaissance .................................................................... 32

8.1.3 Regulatory Agency Records .......................................................... 33

8.1.4 Previous Environmental Reports ................................................... 33

8.1.5. Interviews .................................................................................. 34

8.1.6. Limited Phase II Environmental Site Assessment .......................... 34

8.2 Data Failures, Data Gaps, and Other Opinions ................................... 34

8.2.1 Data Failures .............................................................................. 34

8.2.2 Data Gaps .................................................................................. 35

8.3 Conclusions ..................................................................................... 35

8.3.1 RECs .......................................................................................... 35

8.3.2 HRECs ........................................................................................ 36

8.3.3 De Minimis Conditions ................................................................. 36

8.3.4 Non-ASTM Conditions .................................................................. 36

9.0 REFERENCES ........................................................................................................................... 38

**Table of Contents (cont.)**

**FIGURES**

Figure 1 ...............................................................................................Site Location Map
Figure 2 ................................................................................................................ Site Map
Figure 3 ................................Site Map Depicting Relevant Features and Boring Locations
Figure 4 ...........................................................PCE Concentrations in Soil Vapor @ 5 Feet bgs

**TABLES**

Table 1...................................................................................Detected VOCs in Soil Vapor

**APPENDICES**

Appendix A..................................................................... Professional Qualifications
Appendix B ....................................................................................EDR - Tax Map Report
Appendix C ..........................................................EDR - Environmental Lien Search
Appendix D......................................................... User & Owner/Occupant Questionnaires
Appendix E.........................................................EDR - Radius Map with GeoCheck® Report
Appendix F....................................................................EDR - Sanborn® Map Report
Appendix G....................................................EDR - Aerial Photo Decade Package
Appendix H........................................EDR - Historical Topographic Map Report
Appendix I............................................................. EDR - City Directory Abstract
Appendix J......................................................Regulatory Agency Correspondence
Appendix K............................................................ Previous Environmental Reports
Appendix L............................................................................. Photographic Log
Appendix M................................................................. Laboratory Analytical Results



## 1.0 INTRODUCTION

Gannett Fleming, Inc., (Gannett Fleming) was retained by SJB Properties, LLC (SJB) to conduct a Phase I and limited Phase II Environmental Site Assessment (ESA) for the properties located at 1355, 1363 and 1367 North Avalon Boulevard, in Wilmington, Los Angeles, California (the Site, Figure 1). The Site is rectangular in shape and approximately 1.14 acres in size (Figure 2). The Site currently consists of a 20,068 square foot two-story retail building on the 1355 property, a 2,400 square foot building on the 1363 property, and a 5,500 square foot building on the 1367 property. The remainder of the Site is comprised of asphalt-paved parking areas and rear storage yards at the 1355 and 1363 properties.

## 1.1 Purpose

The purpose of this Phase I ESA was to identify recognized environmental conditions (RECs) or potential environmental conditions associated with the previous activities conducted at the Site. In addition, Gannett Fleming performed a Phase II subsurface investigation to assess shallow tetrachloroethylene (PCE) soil vapor impacts at the Site associated with onsite dry cleaner facility.

Gannett Fleming understands that this Phase I ESA was performed to support the purchase of the Site by SJB.

## 1.2 Detailed Scope of Services

Gannett Fleming performed the Phase I ESA scope of work in a professional manner using standard practices of the environmental consulting industry. The proposed scope of work for this Phase I ESA was developed to comply with Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process (ASTM E 1527-05) and the requirements of the scope of work contained in the All Appropriate Inquiries (AAI) Final Rule 40 CFR Part 312 *et seq*. The Phase I ESA was performed by an environmental professional as defined in ASTM E 1527-05. In addition, Gannett Fleming performed a Phase II subsurface investigation for pesticides in soil.

The scope of work completed for this Phase I ESA included the following elements: review of the history of ownership and operations at the Site; review of reasonably ascertainable agency records, historical documents, and aerial photographs; interviews with personnel knowledgeable with the Site; a site reconnaissance; and report preparation.

During the completion of this Phase I ESA, Gannett Fleming contacted or obtained information from the following individuals and agencies:

- Los Angeles Public Health Investigation (LAPHI);
- Los Angeles Regional Water Control Board (LARWQCB);
- Department of Toxic Substances Control (DTSC);
- City of Los Angeles Department of Sanitation (LADS);
- Los Angeles County Sanitation District – Industrial Waste (LACSD);
- Los Angeles Department of Building and Safety (LADBS);
- City of Los Angeles Department of Public Works (LADPW);



- City of Los Angeles Fire Department (LAFD);
- South Coast Air Quality Management District (SCAQMD);
- Division of Oil, Gas, and Geothermal Resources (DOGGR);
- State Fire Marshall;
- Los Angeles County Department of Public Works (LACDPW); and
- Environmental Data Resources (EDR).

Gannett Fleming conducted a limited Phase II ESA consisting of 10 soil vapor borings to screen the shallow soil vapor at the Site for the potential presence of VOCs, given the presence of the onsite dry cleaner facility at 1367 North Avalon Boulevard and the PCE impacts detected during previous investigations. Ten soil vapor samples were collected and analyzed via mobile laboratory for VOCs by USEPA Method 8260B.

### 1.3 Limitations and Exceptions

This assessment report, prepared consistent with ASTM standards in effect at the time services were rendered for Environmental Site Assessments, is based partially on information, documents and data obtained from others. Gannett Fleming makes no warranty or guarantee concerning the accuracy or completeness of this information in describing historical or current site operations or environmental conditions. Some of the information presented in this report may be subject to varying interpretations and conclusions. The information contained in this report was developed from information available and conditions observed on the survey date. Gannett Fleming shall not be liable for financial or other losses or subsequent damage caused by or related to any use of this document.

A site reconnaissance was performed on October 24, 2013 by Mr. Ryan Kelleher of Gannett Fleming to observe site conditions. During the site reconnaissance, Gannett Fleming also inspected properties in the immediate vicinity of the Site. It should be noted that Gannett Fleming was not permitted access to the interior of the onsite structures located at 1363 and 1367 North Avalon Boulevard. The site reconnaissance was performed to observe land use and operations at the Site and adjacent properties and to note obvious RECs such as abandoned drums, stained surface soils, underground and aboveground storage tanks, and filled areas. Portions of adjacent properties may not have been visible from Gannett Fleming's observation point on the Site and/or public rights-of-way.

The following items are considered non-scope considerations under ASTM E 1527-05 and were not included in the scope of work for this Phase I ESA:

- A survey for asbestos-containing materials (ACMs);
- Radon surveys;
- Lead-based paint (LBP) surveys;
- Lead in drinking water;
- Wetlands evaluation;
- Regulatory compliance auditing;
- Cultural and historic resources;



- Industrial hygiene;
- Health and safety;
- Ecological resources;
- Endangered species;
- Indoor air quality; and,
- High voltage power lines.

**1.4 Qualifications**

The Phase I ESA and subsurface investigation was conducted under the direction of Mr. Leo Rebele and Mr. Michael Crews, environmental professionals (EP) as defined by ASTM E 1527-05 (Appendix A).

**1.5 User Disclaimer**

This assessment report is based partially on information, documents, and data obtained from others, and Gannett Fleming makes no warranty or guarantee concerning the accuracy and completeness of the information received from these parties in describing past site operations or environmental conditions. Some of the information in this report may be subject to varying interpretation and conclusions. The information contained in this report was developed from information available and conditions observed on the date of the site reconnaissance.

This assessment report was prepared for the exclusive use of SJB, its successors, or assigns, and reliance on it by other parties must be authorized by Gannett Fleming in writing.

In the event of any conflict between the terms and conditions of this report and the terms and conditions of the consulting services agreement between SJB and Gannett Fleming, the consulting services agreement shall control.



## 2.0 SITE DESCRIPTION

### 2.1 Location

The Site is comprised of the properties with addresses 1355, 1363, and 1367 North Avalon Boulevard, in the community of Wilmington within the City of Los Angeles, California (Figure 1).

### 2.2 Site and Vicinity General Characteristics

The Site is approximately 1.14 acres in size and consists of three parcels (parcel identification number 7420-007-035, 7420-007-036, and 7420-007-040; Figure 2). The parcel numbers were verified on the Los Angeles County Assessor's database and encompass the entire Site (Appendix B).

The 1355 property is currently improved with a 20,068 square foot former retail grocery store (One Stop Discount Mart) and restaurant (Tia's Tacos). The remainder of the Site is comprised of an asphalt-paved parking lot. The building at 1355 is a slab-on-grade construction, with the exception of a small sub-grade basement located in the southeast corner of the building; it also features a small attic area on its eastern portion and an exterior storage yard area on the southern portion of the property. The 1363 property is occupied by a 2,400 square foot building on the 1363 property, and the 1367 property is occupied by 5,500 square foot building that adjoins the building at 1363.

### 2.3 Current Uses of the Adjoining Properties

The following is a list of current uses of adjoining properties as identified by visual observations made during the site reconnaissance on October 24, 2013:

**North:** The Site is bordered to the north by commercial use, with a Taco Bell restaurant to the adjacent north with the Pacific Coast Highway located farther north.

**South:** Directly to the south of the Site is a coin-operated laundromat facility with additional commercial retailers farther to the south.

**East:** The Site is bordered to the east by North Avalon Boulevard, with a shopping center located across the street.

**West:** To the west of the Site is an alley followed by residential use.

The adjoining properties discussed above are depicted in Figure 2. Additional discussion concerning the environmental condition of off-site properties is provided in Section 4.1.2.

### 2.4 Physical Setting Sources

A property's setting critically influences its potential to be impacted from possible on-site and off-site sources, and also influences the probable extent and magnitude of the resulting contamination. Of particular importance in controlling potential site contaminant source, behavior and transport characteristics are the geologic and hydrogeologic setting, climatic setting, and land-use setting.



### 2.4.1 Topographic Map

Based on the current USGS topographic map (EDR, 2013), the Site is located at an elevation of 42 feet above mean sea level (amsl).  The topographic map depicts the Site as having a generally west to northwest gradient.  Surface runoff flows generally toward the west and discharges into the adjacent drainage swale located in the alley, or flows east into the adjacent North Avalon Boulevard.  The Bixby Slough is located approximately 1.5 miles west of the Site, the Dominguez Channel located approximately 1.75 miles east of the Site, the Los Angeles River located approximately 3.5 miles to the east of the Site, and the Pacific Ocean located approximately 2 miles south of the Site.  No other apparent surface water features (e.g., rivers, lakes) are located in close proximity to the Site.

### 2.4.2 Soil Survey

Information concerning the local soil conditions was obtained using the Soil Conservation Service (STATSGO).  According to the data, the surficial soil types include: sandy loam, gravelly – sandy loam, silt loam, clay, fine sand, gravelly- sand, sand, and fine sandy loam.  Deeper soil types include: gravelly – sandy loam, sandy loam, very gravelly – sandy loam, stratified, very fine sandy loam, weather bedrock, sand, gravelly – fine sandy loam, silty clay loam, and clay loam.

### 2.4.3 Geology and Hydrogeology

The Site is regionally located within the Long Beach Plain, which is bounded to the north by Signal Hill, to the south by the Pacific Ocean, with the Los Angeles River to the east and Coyote Creek to the west.  According to a previous subsurface investigation conducted at a property located at 1345 West Pacific Coast Highway (approximately one mile east of the Site), shallow soils beneath the property consisted of silty clayey sand, silty sand, and silt to approximately 20 feet below ground surface (bgs), and predominantly fine to very fine-grained sand and trace silt and shell fragments from 20 feet bgs to 100 feet bgs.  Groundwater was encountered from 36.18 to 41.08 feet bgs, and found to flow to the northwest. (AECOM 2013)

According to the EDR report, the topography of the Site is generally to the south-southwest and anticipated groundwater flow direction at the Site is generally to the northwest.

### 2.4.4 Well Information

According to the EDR® Physical Setting Source Map, 594 oil, gas or related wells were located within a one-mile radius of the Site.  Thirty-five water wells were noted within a one-mile radius of the Site.



## 3.0 USER PROVIDED INFORMATION

### 3.1 Environmental Liens or Activity and Use Limitations

Gannett Fleming identified no environmental liens or use limitations associated with the 1355 North Avalon Boulevard address (Appendix C).

### 3.2 Specialized Knowledge

Mr. Abraham Kahen, on behalf of SJB Properties, LLC, completed a user questionnaire to address specific questions addressed by ASTM-05-1527. Mr. Kahen had no specialized knowledge of any environmental concerns pertaining to the Site, with the exception of his indication that contamination potentially exists at the property due to the historical operation of a dry cleaner facility at the 1367 North Avalon Boulevard address. Additionally, Mr. Kahen indicated that the purchase price of the property may be affected by the results of the subsurface investigation; the results of the subsurface investigation conducted by Gannett Fleming on October 24, 2013 are presented in section 6.0 of this report. A copy of the completed user questionnaire is provided in Appendix D.

### 3.3 Valuation Reduction for Environmental Issues

According to ASTM E 1527-05, it is the responsibility of the user of this Phase I ESA to consider the relationship of the purchase price of the property to the fair market value of the property if the property was not affected by hazardous substances or petroleum products. The user should try to identify an explanation for a lower price that does not reasonably reflect fair market value if the property were not contaminated and make a written record of such explanation. Among the factors to consider will be the information that becomes known to the user pursuant to this Phase I ESA report. The ASTM standard does not require that a real estate appraisal be obtained in order to ascertain fair market value of the property.

According to the user questionnaire (Appendix D), there is no currently agreed upon price for purchase of the property, and the future purchase price may be affected by the results of the subsurface investigation conducted by Gannett Fleming on October 24, 2013.

### 3.4 Owner, Property Manager, and Occupant Information

Ms. Rosa Estrada, the current owner of the property located at 1355 North Avalon Boulevard, completed an owner-occupant questionnaire to address specific questions addressed by ASTM-05-1527. Ms. Estrada's first-hand knowledge of the 1355 property portion of the Site began in 1988. Based on information and her knowledge of the Site, there were no features or indicators representing a recognized environmental concern. An attempt was made to obtain a completed owner-occupant questionnaire from the owners of the 1363 and 1367 properties; however, at the time of this report, Gannett Fleming has not received a completed owner-occupant questionnaire pertaining to either of the properties.



**3.5 Reason for Performing Phase I ESA**

The Phase I ESA was conducted for environmental due diligence purposes and in order to satisfy ASTM E-1527-05 and comply with "All Appropriate Inquiries" (40 CFR 312 *et seq.*).



**4.0 ENVIRONMENTAL AND HISTORICAL RECORDS REVIEW**

The purpose of the records review was to obtain and review available governmental and non-governmental records to determine whether RECs exist in connection with the Site or immediate vicinity of the Site.

**4.1 Standard and Additional Environmental Record Sources**

Databases maintained by various State and Federal regulatory agencies were reviewed for the Site and properties in the vicinity of the Site.  This review of agency database information was compiled by Environmental Data Resources, Inc., (EDR) of Southport, Connecticut, an information search firm that utilizes computer search techniques to query governmental agency database information for a specified geocoded area.  Search radii comply with or exceed those specified in ASTM E 1527-05.  Gannett Fleming obtained an EDR-Radius Map with GeoCheck® (database search report) dated October 28, 2013 (Appendix E).

**4.1.1 Site**

The Site address was not listed on any of the searched regulatory agency databases, except for the following:

- **Montgomery Cleaners,** located at 1367 North Avalon Boulevard is listed on the Drycleaners and the EDR US Historical Cleaners databases.  These database listings are associated with the historical operation of a dry cleaning facility at the property; according to the database listings, the facility was inactive as of June 2007.  Due to the potential for subsurface impacts to exist beneath the Site, the presence of the dry cleaner at the Site represents a recognized environmental condition.  During the site reconnaissance performed as part of this Phase I ESA, Gannett Fleming observed the building which appeared to be vacant; Gannett Fleming was not permitted access to the interior of the former dry cleaner facility.  The subsurface investigation performed by Gannett Fleming in October 2013 targeted the 1355 property to determine if the underlying soil vapor is impacted with VOCs.  The results of the subsurface investigation are discussed in Section 6.0 of this report.

**4.1.2 Off-Site**

The following is a summary of properties that Gannett Fleming identified as warranting further discussion due to their proximity to the Site, gradient location (i.e., hydraulically up-gradient, cross-gradient), or nature of the release:

- **Laundra Lux Cleaners**, located at 1354 North Avalon Boulevard (approximately 165 feet south-northeast of the Site), is listed on the following databases: RCRA-Small Quantity Generators, FINDS, and EDR US Historical Cleaners.  According to the RCRA-SQG database listing, the facility produced between 100 and 1,000 kilograms of an unspecified hazardous waste each month in 1997.  No violations were found in connection with the facility.  The information in the database



listings indicates the facility operated as a dry cleaner from as early as 1997 to as recently as 2012. Considering its proximity to the property and its historical use a dry cleaner facility, and apparent hydraulically down to cross-gradient position relative to the Site, this facility appears to present a low to moderate risk of adverse environmental impact to the Site.

- **Industrial Paint Co.**, located at 1342 North Avalon Boulevard (approximately 165 feet northeast of the Site) is listed on the CA FID UST and SWEEPS UST databases. According to the database listings, the facility historically featured an underground storage tank which is currently inactive. No other information is provided. Based on lack of a reported release, this facility does not appear to present a significant risk of adverse environmental impact to the Site.

- **Wilmington Town Lot #092**, located at 129 N street (approximately 238 feet east of the Site), is listed on the SLIC database, indicating a past release occurred at the site. According to the database listing, cleanup at the property occurred under the oversight of LARWQCB, and the facility received regulatory case closure in 2000. No other details were provided regarding the release or cleanup activities that occurred at the property. Based on the cross gradient location of the facility relative to the Site, as well as the lack of information to indicate past releases, this facility does not appear to present a significant risk of adverse environmental impact to the Site.

- **Wilmington Town Lot #089**, located at 1346 Marine Avenue (approximately 200 feet west-southwest of the Site), was listed on the SLIC database. The SLIC database listing is associated with a past release of petroleum hydrocarbons at the property. The facility received case closure in April 2000; no other details are provided. Based on the cross-gradient location of the facility relative to the Site, and closure status, this facility does not appear to present a significant risk of adverse environmental impact to the Site.

- **Wilmington Town Lot #086**, located at 1341-1345 Marine Avenue (approximately 209 feet west-southwest of the Site), was listed on the SLIC database. The SLIC database listing is associated with a past release of petroleum hydrocarbons at the property. The facility received case closure in May 1999; no other details are provided. Based on the cross-gradient location of the facility relative to the Site, and closure status, this facility does not appear to present a significant risk of adverse environmental impact to the Site.

- **Wilmington Town Lot #090**, located at 1326 Marine Avenue (approximately 234 feet southwest of the Site), was listed on the SLIC database. The SLIC database listing is associated with a past release of petroleum hydrocarbons at the property. The facility received case closure in July 1999; no other details are provided. Based on the cross-gradient location of the facility relative to the Site, and closure status, this facility does not appear to present a significant risk of adverse environmental impact to the Site.



- **Wilmington Town Lot #088**, located at 1311 Marine Avenue (approximately 329 feet south-southwest of the Site), was listed on the SLIC database. The SLIC database listing is associated with a past release of petroleum hydrocarbons at the property. The facility received case closure in May 2000; no other details are provided. Based on the cross-gradient location of the facility relative to the Site, and closure status, this facility does not appear to present a significant risk of adverse environmental impact to the Site.

- **Wilmington Town Lot #137**, located at 128 E. M Street (approximately 414 feet south-southeast of the Site), was listed on the SLIC database. The SLIC database listing does not provide details about the nature of the release or the contaminants involved. The facility received case closure in May 1999; no other details are provided.  Based on the cross-gradient location of the facility relative to the Site, and closure status, this facility does not appear to present a significant risk of adverse environmental impact to the Site.

- **LADW&P – Harbor Steam**, located at 161 N. Island (approximately 376 feet east of the Site), was listed on the RCRA-Small Quantity Generators and US AIRS database.  According to the RCRA-SQG database listing, the facility produced between 100 and 1,000 kilograms of an unspecified hazardous waste each month in 2006.  The facility was also listed as a large quantity generator in other years; no violations were found in association with the facility.   The facility was listed on the Aerometric Information Retrieval System Facility Subsystem (AIRS/AFS) database is due to the facility's status as a stationary point source of air pollution; according to the database listing, the facility is a generator station.   The records associated with this database predominantly pertain to demonstrating compliance with the title V permits held by the facility; no significant violations were reported that would indicate associated impacts at the target property exist. Based on the lack of a reported release and its apparent hydraulically cross-gradient position, this facility does not appear to present a significant risk of adverse environmental impact to the Site.

- **South Region Span K-8 #1, Site 15,** located at East M Street and North Avalon Boulevard (approximately 766 feet south-southeast of the Site), is listed on the School Property Evaluation Program (SCH) and Envirostor databases. According to the database listings, the property is a school cleanup site where previous investigations revlealed soil contaminated with arsenic, chlordane, 4,4-DDD, 4,4-DDE, 4,4-DDT, dieldrin, toxaphene, and TPH-diesel associated with historical uses at the site which included refinery pipelines.  Under the oversight of DTSC, 179 tons of impacted soil was removed from the property in May 2009, and the DTSC subsequently approved the Removal Action Completion Report that was produced for the site.  Considering the nature of the impacts at the facility, as well as the fact that they have deemed adequately addressed by the DTSC, the facility does not appear to present a significant environmental concern to the Site.



- **LAUSD Fries Elementary School**, located at 1301 Fries Avenue (approximately 649 feet southwest of the Site), is listed on the following databases: RCRA-Small Quantity Generators, FINDS, School Property Evaluation Program (SCH), and Envirostor.  According to the RCRA-SQG database listing, the facility produced between 100 and 1,000 kilograms of an unspecified hazardous waste each month in 1987.  According to the SCH and Envirostor database listings, the facility was identified by DTSC and Los Angeles Unified School District (LAUSD) as needing assessment due to potential lead impacts to soil.  According to Envirostor records, LAUSD dropped the site in June 2000.  Due to the proximity and cross-gradient location of the facility relative to the Site, as well as the lack of evidence to indicate associated impacts exist at the target property, it is not considered to present an environmental concern.

- **Pacific Bell**, located at 1418 North Broad Avenue (approximately 635 feet northeast of the Site), is listed on the following databases: RCRA-Small Quantity Generator, FINDS, CA FID UST, UST, Historical UST, SWEEPS UST, Haznet, and EMI.  According to the RCRA-SQG database listing, the facility produced between 100 and 1,000 kilograms of an unspecified hazardous waste each month in 1996.  The facility is listed on the CA FID UST, UST, Historical UST, and SWEEPS UST databases due to the presence of a UST at the property used to store diesel product; according to the HIST UST listing, the UST was installed in 1981, and the tank is still active based on the SWEEPS UST listing.  The Haznet listing from 2011 indicates polychlorinated biphenyls (PCBs) were stored onsite; haznet records from 2007 indicate that asbestos containing waste was removed from the Site and transported to a landfill.  No violations or other records were reported that would indicate a previous release or material threat of release from this property; therefore this facility is not considered to present an environmental concern.

- **Coast Highway Imports**, located at 211 West Pacific Coast Highway (approximately 391 feet northwest of the Site), is listed on the following databases: RCRA-Small Quantity Generator, FINDS, and Haznet.  According to the RCRA-SQG database listing, the facility produced between 100 and 1,000 kilograms of an unspecified hazardous waste each month in 1996.  The listing of the facility on the Haznet database indicates the production of the following wastes at the property between 1999 and 2003: unspecified aqueous solution, oxygenated solvents, and aqueous solution with total organic residues 10 percent or greater. Based on the lack of a reported release and nature of the hazardous materials stored, this facility does not appear to present a significant risk of adverse environmental impact to the Site.

## 4.2 Historical Use Information on the Subject and Adjoining Properties

As required by ASTM E 1527-05, all obvious uses of the Site shall be identified from the present, back to the property's first developed use, or back to 1940, whichever is earlier. This task requires reviewing only as many of the standard historical sources as are necessary, and that are reasonably ascertainable and



likely to be useful. Gannett Fleming's historical research attempted to identify the historical Site use back to the property's first modern use.  The following subsections describe the findings from each historical source consulted by Gannett Fleming as part of this assessment.

### 4.2.1 Historical Sanborn™ Fire Insurance Maps

No fire insurance map information was found within the Sanborn Library covering the Site or the nearby vicinity. A copy of the EDR - Historical Sanborn™ Fire Insurance Maps is provided in Appendix F.

### 4.2.2 Aerial Photographs

Gannett Fleming conducted a review of historical aerial photographs as summarized in Table 4-1.  The aerial photographs were provided by EDR. Copies of the aerial photograph package are provided in Appendix G.

| Table 4-1.  Aerial Photograph Summary | | | | |
|---|---|---|---|---|
| Date | Source of Aerial | Scale | Site | Adjacent Properties |
| 1928 | Fairchild | 1" = 500' | The Site appears to be largely vacant, and appears to be occupied by a single residential structure in the approximate vicinity of the current dry cleaner structure. | The surrounding area is largely comprised of agricultural areas and some residential structures. Banning High School is visible to the northeast and Banning Park to the east of the Site. |
| 1947 | Fairchild | 1" = 500' | The Site appears relatively unchanged since the 1928 aerial photograph. | No significant changes are observed except, additional development of residential structures and what appear to be a few commercial structures to the far west. |
| 1956 | Fairchild | 1" = 500' | The Site has been developed with commercial structures and resembles its present day appearance. | Additional development has occurred in the surrounding area with a paved parking lot completed immediately west of the Site. Some small commercial structures to the north of the Site and |

*Gannett Fleming*

| Table 4-1.  Aerial Photograph Summary | | | | |
|---|---|---|---|---|
| Date | Source of Aerial | Scale | Site | Adjacent Properties |
| | | | | various residential structures completed in the Site's vicinity. |
| 1963 | EDR | 1" = 500' | No significant changes have occurred to the Site since the 1956 aerial photograph. | No significant changes have occurred to the adjacent properties since the 1956 aerial photograph. |
| 1972 -2012 (1981,1989, 1994, 2005, 2009, 2010, 2012) | EDR | 1" = 500' | The Site features have remained virtually unchanged from the 1972 through 2012 aerial photographs. | The immediately vicinity property features have remained virtually unchanged from the 1972 through 2012 aerial photographs. |

Gannett Fleming identified no environmental concerns based on its review of the historical aerial photographs. Copies of the aerial photographs can be found in Appendix G.

### 4.2.3 Historical Topographic Map Review

The following United States Geological Survey (USGS) maps were obtained from EDR and were reviewed as part of this Phase I ESA. A summary of is provided for each map in Table 4-2.

| Table 4-2.  Historical USGS Topographic Map Summary | | | | |
|---|---|---|---|---|
| Date | Map Name | Scale | Site | Adjacent Properties |
| 1896 | Redondo | 1:62,500 | The Site is not discernible at this scale. | The surrounding properties are not discernible at this scale. |
| 1901 | Southern CA Sheet 1 | 1:250,000 | The Site is not discernible at this scale. | The surrounding properties are not discernible at this scale. |



| | | | Table 4-2.  Historical USGS Topographic Map Summary | |
|---|---|---|---|---|
| Date | Map Name | Scale | Site | Adjacent Properties |
| 1925 | Wilmington | 1:24,000 | The Site appears to be vacant, but is not easily discernible. | Most of the surrounding land appears vacant, with sporadic unidentified structures and a network of roads. |
| 1948 | Redondo | 1:50,000 | The Site is not discernible at this scale. | The surrounding properties are not discernible at this scale. |
| 1951 | Torrance | 1:24,000 | The Site appears to have 3 oil wells located either on the properties or in the immediate vicinity of the properties. | Oil wells appear frequently throughout the surrounding area. The surrounding land features occasional structures. Banning Park is visible to the east and Bixby Slough is visible to the west. An oil tank field is visible to the far north of the Site. |
| 1951 | Long Beach Vicinity | 1:24,000 | The Site appears unchanged compared to the 1951 "Torrance" topographic map. | No significant changes have been made to the surrounding properties compared to the 1951 "Torrance" map. |
| 1964 | Torrance | 1:24,000 | The Site appears unchanged since the 1951 topographic maps. | No significant changes have been made to the immediately surrounding properties since 1951 topographic maps. |
| 1972 | Torrance | 1:24,000 | No significant changes are observed of the Site since 1964 topographic map. | No significant changes have been made to the immediately surrounding properties since 1964 topographic map, except the removal of some of the oil tanks to the far north of Site |



| Table 4-2.  Historical USGS Topographic Map Summary | | | | |
|---|---|---|---|---|
| Date | Map Name | Scale | Site | Adjacent Properties |
| | | | | and the development of the surrounding land into what appears to be residential areas. |
| 1981 | Torrance | 1:24,000 | No significant changes are observed of the Site since the 1972 topographic map. | No significant changes have been made to the immediately surrounding properties since 1972 the topographic map. |

Gannett Fleming identified no environmental concerns based on its review of the historical topographic maps, with the exception of the following:

- Three (3) oil wells were identified on the same block as the properties as early as 1951. It is difficult to discern if they are contained within the current properties' boundaries or immediately adjacent. Oil wells are depicted frequently in the surrounding area as well.

Copies of the topographic maps can be found in Appendix H.

### 4.2.4 City Directory Abstract

Gannett Fleming conducted a review of historical city directories provided by EDR for the Site and nearby properties. Copies of the City Directory Review have been included in Appendix I.

| Table 4-3.  Historical City Directory Summary | | | |
|---|---|---|---|
| Date | Listing Address | Listing Name | Approximate Distance and Direction from Site |
| **Target Properties** | | | |
| 1975-80 | 1355 N. Avalon Blvd. | Pic N Save | Target Site |
| 1980 | | | |
| 1985-Present | | Acapulco Market | |



| Table 4-3.  Historical City Directory Summary | | | |
|---|---|---|---|
| Date | Listing Address | Listing Name | Approximate Distance and Direction from Site |
| 1950-80 | 1363 N. Avalon Blvd. | Farmers Insurance Group | |
| 1980-Present | | La Perla Bakery | |
| 1950-54 | 1367 N. Avalon Blvd. | Hill Frank RRR | |
| 1954-2001 | | Montgomery C H | |
| 2001-Present | | Rendon Felipe | |
| **Adjacent Properties** | | | |
| 1950 | 100 W. Pacific Coast Highway | Brownie's Texaco Service | North of Site; adjacent to Site |
| 1954 | | Brownie's Texaco Service | |
| 1964 | | Sanchez Armando | |
| 1969 | | Deborah Liquor | |
| 1985 | | Phil & Dan's Liquor; Western Union; Sunshine Donut; Standard Oil Company of CA Stations Inc. | |
| 1990 | | Taco Bell | |
| 1991 | | Texaco Trading & Transportation Inc. | |
| 1995-Present | | Taco Bell | |
| 1960 | 111 W. Pacific Coast | Gonzalez Paint & Hardware | North of Site; across |



| Table 4-3.  Historical City Directory Summary | | | |
|---|---|---|---|
| Date | Listing Address | Listing Name | Approximate Distance and Direction from Site |
| 1990 | Highway | 2-For-1 Pizza Company; Avalon Donuts, Cakes & Cookies; Joe's Bicycle Shop; EZ Check Cashing Center; Rent-a-Center | Pacific Coast Highway |
| 1995 | | 98 Cents Discount Store; Heidy Travel; Joe's Bicycle Shop; Super Mail International; Antonio's Pizza; Rent-a-Center | |
| 2008-Present | | Rent-a-Center; CA Cash Advance; Pacific Cash Advance; Avalon Pharmacy; 3D Nutrition; 7-Eleven | |
| 1950-54 | 124 W. Pacific Coast Highway | Gene's Richfield Services | Northwest of Site; across alleyway |
| 1969 | | Rubena A Mason | |
| 1985 | | Justa | |
| 1950-80 | 125 W. Pacific Coast Highway | Foodman Market | Northwest of Site; across Pacific Coast Highway |
| 1995 | | Speaker Plus; Sunshine Homes Realty; Wilmington Furniture; Guadalupana Flower Shop; Star Children Clothing; Botanica Gracia de Dios; Kim's Mens & Womens Underwear; J&R Clothing; P&S Handbag; M&F Refrigeration; Joyeria Mini Precios | |
| 1990 | | Nancy's Clothes for Children; Pena Furniture; Kim's Mens & Womens Underwear; J&R Clothing; Kim's Watch Shop; Amor de Oro Jewelry; Sunny | |



| Table 4-3.  Historical City Directory Summary | | | |
|---|---|---|---|
| Date | Listing Address | Listing Name | Approximate Distance and Direction from Site |
| | | Shoes | |
| 2008 | | LaLa's Beauty Salon; Jeveen Perfumes; Compu Express | |
| 2013 | | Wilmington Indoor Swapmeet | |
| 1964-Present | 1324 N. Avalon Blvd. | Jacobsen J A & Associates Inc.; Bureau Veritas International Register | Southeast of Site; across N. Avalon Blvd. |
| 1964-70 | 1327 N. Avalon Blvd. | Quick Clean Center | South of Site; adjacent to Site |
| 1957-85 | | John W Barry MD | |
| 1990 | | Clinique des Femmes | |
| 2008 | 1334 N. Avalon Blvd. | Laundraluxe Cleaners; Optimize Garage Door; Ultimate Cell Phone Accessories; Candido Sanchez | Southeast of Site; across N. Avalon Blvd. |
| 2013 | | Laundraluxe Cleaners; Clinica Familiar de los Latinos; Natalie's Flower Shop | |
| 1957-2008 | 1366 N. Avalon Blvd. | Western Union; Hawaii Accommodation; Accurate Business Services; Holiday Travel Agency; Judy's Flower Shop | East of Site; across N. Avalon Blvd. |
| 1954-60 | 1378 N. Avalon Blvd. | T B Smith MD | Northeast of Site; across N. Avalon Blvd. |
| 1964 | | Chicken Delight Restaurants | |

The review of historical city directories confirms the presence of the Montgomery dry cleaners on the



Site as early as 1954. In addition, another dry cleaning facility (Laundraluxe Cleaners) was identified southeast of the Site, across N. Avalon Blvd., and has been present as early as 2008. South and adjacent to the Site, a business with a name suggesting a dry cleaning facility (Quick Clean Center) was identified as early as 1964, but was observed to be only a coin-operated laudromat at the time of the site reconnaissance.

**4.2.5 Regulatory Agency Records Review**

Contact with governmental agencies was made via facsimile, telephone conversations or mail. Regulatory Agency Correspondence is included in Appendix J. The following is a list of the governmental agencies contacted for this report:

- Los Angeles Public Health Investigation (LAPHI);
- Los Angeles Regional Water Control Board (LARWQCB);
- Department of Toxic Substances Control (DTSC);
- City of Los Angeles Department of Sanitation (LADS);
- Los Angeles County Sanitation District – Industrial Waste (LACSD);
- Los Angeles Department of Building and Safety (LADBS);
- City of Los Angeles Department of Public Works (LADPW);
- City of Los Angeles Fire Department (LAFD);
- South Coast Air Quality Management District (SCAQMD);
- Division of Oil, Gas, and Geothermal Resources (DOGGR);
- State Fire Marshall;
- Los Angeles County Department of Public Works (LACDPW); and
- Environmental Data Resources (EDR).

**Los Angeles County Public Health Investigation (LACPHI)**

Gannett Fleming contacted the LACPHI via facsimile on October 25, 2013 for any records for the Site. On October 31, 2013 LACPHI informed Gannett Fleming via facsimile that no records exist for the property located at 1355 North Avalon Boulevard. At the time of this report, Gannett Fleming has not received a response from LARWQCB regarding records for the properties located at 1363 and 1367 North Avalon Boulevard. This is not considered to be a significant data gap that would alter the conclusions of this report; if Gannett Fleming receives records from LACPHI after this report is finalized, a letter addendum summarizing the contents of the records shall be prepared to accompany the report.

**Los Angeles Regional Water Quality Control Board (LARWQCB)**

Gannett Fleming contacted the LARWQCB via e-mail on October 25, 2013 for any records for the Site. LARWQCB contacted via e-mail on November 5, 2013 stating that there are no records for the property located at 1355 North Avalon Boulevard. At the time of this report, Gannett Fleming has not received a response from LARWQCB regarding records for the properties located at 1363 and 1367 North Avalon



Boulevard; however, Gannett Fleming searched Geotracker, the online database maintained by LARWQCB for records pertaining to the Site, and none were found.

**Department of Toxic Substances Control (DTSC)**

Gannett Fleming contacted the DTSC via facsimile on October 25, 2013 for any records for the Site.  DTSC contacted Gannett Fleming via letter on October 30, 2013 stating that there are no records for the 1355 North Avalon Boulevard property.  On November 14, 2014, DTSC staff informed Gannett Fleming via telephone that no records exist for the properties located at 1363 or 1367 North Avalon Boulevard. Gannett Fleming researched the DTSC records via their internet database, Envirostor, on October 25, 2013, for any records pertaining to the Site.  The DTSC online records contain no data concerning the Site.

**City of Los Angeles Department of Sanitation (LADS)**

Gannett Fleming contacted the LADS via facsimile on October 30, 2013 for any records for the Site.  LADS contacted Gannett Fleming via facsimile, and provided copies of the available permit records for the Site. According to these records, former grocery market operations at the 1355 North Avalon Boulevard property included a waste water treatment system which was historically utilized for washing of equipment, floors, fruits, vegetables, and meats, and is connected to the municipal sewer system via an eight-inch vitrified clay pipe.  Due to the lack of evidence to indicate that historical waste water treatment operations included hazardous materials, the feature is not considered to present an environmental concern.

**Los Angeles County Sanitation District – Industrial Waste (LACSD)**

Gannett Fleming contacted the LACSD via facsimile on October 30, 2013 for any records for the Site.  On October 31, 2013, LACSD contacted Gannett Fleming via telephone and stated that no records exist for the Site.

**Los Angeles Department of Building and Safety (LADBS)**

Gannett Fleming contacted the LADBS via facsimile for any records pertaining to the Site.  LADBS contacted Gannett Fleming via facsimile on November 12, 2013, and provided a summary report of the available building permit records that exist for the Site.  The summary report shows building permit records for the Site maintained by LADBS date back to 1948, with new construction occurring at the Site in 1952, 1954, 1956 and 1962.  LADBS informed Gannett Fleming that an in-person visit to the LADBS records counter was required to obtain copies of the actual records.  Due to the format of these records (microfilm) and the wait time required to review these records, it was determined that a complete review of records from this source was not considered practicably reviewable, and required a significant investment of time and resources, and therefore did not conform to the scope and limitations of ASTM Practice E 1527-05.  It is not anticipated that a review of these records would alter the findings or conclusions of this report.



**City of Los Angeles Department of Public Works (LADPW)**

Gannett Fleming contacted the LADPW via facsimile on October 30, 2013 for any records for the Site. At the time of this report, Gannett Fleming has not received a response from LADPW. However, based on review of other sources, Gannett Fleming considers it unlikely that any records from this agency would alter the conclusions or recommendations of this report.

**Los Angeles Fire Department (LAFD)**

Gannett Fleming contacted the LAFD via facsimile on October 30, 2013 for any records for the Site. On November 7, 2013, LAFD contacted Gannett Fleming via facsimile stating that no records exist for the addresses.

**South Coast Air Quality Management District (SCAQMD)**

Gannett Fleming reviewed the online records database maintained by SCAQMD on October 30, 2013. No SCAQMD records were identified for the Site address.

**Division of Oil, Gas, and Geothermal Resources (DOGGR)**

Gannett Fleming researched the DOGGR records via their online mapping system on October 30, 2013 and did not identify any existing or former oil wells located on the Site. Though other sources show that the property is located within the Old Wilmington Oil Field, and DOGGR maps illustrate an abundance of oil wells within the vicinity of the Site.

**State Fire Marshall**

Gannett Fleming researched State Fire Marshall National Pipeline Mapping System records via their online mapping system on October 30, 2013 and did not identify any pipelines located on or in the immediate vicinity of the site.

**Los Angeles County Department of Public Works (LACDPW)**

Gannett Fleming contacted the LACDPW via facsimile on October 25, 2013, for any records for the Site addresses. The LACDPW informed Gannett Fleming on October 28, 2013 via facsimile that they have no records for the Site.

**4.2.6 Previous Environmental Report Summary**

One previous environmental report for the Site was provided to Gannett Fleming by SJB. The report consists of a Phase II Site Investigation Report prepared by SCS Engineers (SCS), dated January 2013. The following presents a brief summary of the primary findings of the report. A copy of the previous environmental reports can be found in Appendix K.



**Phase II Site Investigation Report – SCS, 2013**

On January 7, 2013, SCS advanced 11 soil vapor borings to 5 feet bgs across the properties located at 1355, and 1363-1367 North Avalon Boulevard.  Soil vapor samples were collected and analyzed for methane and VOCs.  Results of the laboratory analysis of the vapor samples indicated that shallow soil vapor beneath the Site is impacted with PCE at concentrations that exceed regulatory screening levels, with the generally highest concentrations in the vicinity of the former dry cleaning suite.   Methane was not detected in soil vapor samples; however, since the property is located within a Methane Hazard Zone designated by the City of Los Angeles, it is subject to the requirements of the City's Methane Ordinance, and any renovation of the Property will need to consider the provisions of that ordinance.



**5.0 SITE RECONNAISSANCE**

A site reconnaissance was completed on October 24, 2013 by Mr. Ryan Kelleher of Gannett Fleming.  Mr. Kelleher was not accompanied during the site reconnaissance by the owner or an official representative of ownership.

The purpose of the site reconnaissance was to evaluate the Site for evidence of current or previous activities that may have resulted in adverse environmental impacts.  The following subsections detail visual observations of the ground surface of the Site and other potential sources of contamination during the site reconnaissance.  A photographic log of observations made during Gannett Fleming's site reconnaissance is included in Appendix L.

**5.1 Methodology and Limiting Conditions**

The site reconnaissance involved a visual inspection for potential indicators of on-site contamination and a review of past listed RECs, if available.  The site reconnaissance was conducted by walking along the interior of the Site (where possible) and then by traversing along the boundary of the Site.  Gannett Fleming was not permitted access to the interior of the structures located at 1363 and 1367 North Avalon Boulevard.  Gannett Fleming also recorded observations of off-site properties.

**5.2 General Site Setting**

The Site is approximately 1.14 acres, and is currently improved with a 20,068 square foot former grocery store (One Stop Discount Mart) and former restaurant (Tia's Tacos) at the 1355 property; a 2,400 square foot retail structure (formerly La Perla Bakery) at the 1363 property; and a 5,500 square foot building (formerly Montgomery Cleaners) at the 1367 property.  The remainder of the Site is comprised of asphalt-paved parking lot areas and storage yards on the western side of the 1363 and 1367 properties and on the southern side of the 1355 building.  The buildings are slab-on-grade construction, with the exception of a small sub-grade basement area located in the southeast corner of the 1355 building.  The interior floor of the 1355 structure consists of linoleum tile floor on top of concrete, and the ceilings consisted of drop-down ceiling panels.  The interior portions of the 1355 building were in general poor condition with collapsed portions of ceiling tiles observed in the northern portion of the building.

The Site is bordered to the north by commercial uses including a Taco Bell restaurant to the adjacent north.  Avalon Boulevard is located east of the Site with a small retail shopping center located across the street.  A laundromat facility and associated parking lot are located to the adjacent south of the Site.  An alley way separates the Site from the residential use to the west.

**5.3 Observations**

**5.3.1 Interior and Exterior Observations**

The onsite vacant structure consisted predominantly of linoleum floor tiles with the walls comprising of gypsum board and the ceilings composed of drop-down ceiling tile. Fluorescent light fixtures were observed throughout the building.  The interior of the building was observed to be predominantly vacant,



with the northeast corner of the building formerly occupied by Tia's Tacos restaurant, and the remainder of the structure utilized as a grocery store, One-Stop Discount Mart. A wash area and a water treatment system including three aboveground storage tanks were observed in a small room in the northwest corner of the building. The eastern portion of the building consists of an inventory storage area and restroom facilities. Floor drains associated with the sinks were observed in the former kitchen area as well as in the wash area/water treatment room. A 55-gallon drum with unknown contents was observed near the front entrance of the building on the northern portion of the property. Remnants of the former tenants were observed throughout the interior of the building, which included shopping carts, various household products, storage racks, and vending machines.

The remainder of the Site is comprised of a rear storage yard on the southern portion of the property, as well as asphalt-paved parking areas on the northern and western sides of the Site. Three pole-mounted transformers were observed on the southwest corner of the rear storage area. A 55-gallon drum was observed on the southeast corner of the Site in the rear storage yard area, with the affixed labels indicating that it contains grease produced by the former onsite restaurant. An adjacent dry cleaner, Montgomery Cleaners, was observed to the adjacent north of the Site. All features observed are labeled and depicted in Figure 2.

Gannett Fleming identified no environmental concerns or evidence of recognized environmental conditions (RECs) in connection with site reconnaissance with the exception of the adjacent dry cleaner facility to the north. The soil vapor survey conducted on October 24, 2013 targeted potential soil vapor impacts at the Site associated with the adjacent dry cleaner; the results of the investigation are provided in section 6.0 of this report.

### 5.3.2 Chemical Usage/Waste Storage

Gannett Fleming did not observe any current chemical usage or storage during the site reconnaissance, with the exception of cleaning products that are remnants of the former retail business that occupied the building.

### 5.3.3 Abandoned or Unidentified Containers

Gannett Fleming observed no abandoned or unidentified containers during the site reconnaissance, with the exception of two 55-gallon drums at the Site. One 55-gallon drum was observed on the interior of the building adjacent to the northern entrance, with no indication of the contents. An additional drum was observed on the southern portion of the Site in rear of the building; a label was observed to be affixed to the drum which indicated that the drum was purposed for storing grease produced during operation of the onsite restaurant. No leaking was observed beneath either of the drums that would indicate a release to the Site, and no environmental concern is presented by the presence of the drums.



### 5.3.4 Catch Basins, Pits, Ponds, Lagoons and Drains

Gannett Fleming observed no catch basins, pits, ponds, lagoons, or drains during the site reconnaissance, except for the floor drains located in the water treatment area of the northwest portion of the building as well as the kitchen area of the former restaurant.

### 5.3.5 Dry Wells

Gannett Fleming observed no dry wells on the Site during the site reconnaissance.

### 5.3.6 Soil Staining

Gannett Fleming observed no soil staining on the Site during the site reconnaissance with exception of *de minimis* oil staining observed in the parking lot areas of the Site.

### 5.3.7 Vegetative Stress

Gannett Fleming observed no indications of vegetative stress at the Site.

### 5.3.8 Sheens

Gannett Fleming observed no oily sheens at the Site.

### 5.3.9 Soil Disturbance

Gannett Fleming observed no significant soil disturbance at the Site.

### 5.3.10 Odors

Gannett Fleming observed no chemical-like odors associated with the Site.

### 5.3.11 Underground Storage Tanks (USTs)

Gannett Fleming did not observe evidence of current or former USTs, such as vent pipes or fill ports, at the Site during the site reconnaissance.

### 5.3.12 Aboveground Storage Tanks (ASTs)

Gannett Fleming observed no ASTs at the Site during the site reconnaissance, with the exception of three ASTs associated with the water treatment system observed in the northwest portion of the building.  No staining was observed in the areas of the ASTs and they are not considered to present an environmental concern.



### 5.3.13 Oil and Gas Wells/Activities

Gannett Fleming observed no evidence of current or former oil and gas well activities at the Site during the site reconnaissance.

### 5.3.14 Polychlorinated Biphenyl (PCB)-Containing Materials

Gannett Fleming observed three pole-mounted transformers located at the southern boundary of the Site.  The transformers appeared to be in good condition and no staining or leaking was observed beneath or around the transformers.  The transformer is unlikely to represent an environmental concern to the Site.  In the event that PCB-containing oil leaks from the transformers, the responsibility for cleanup would rest with the utility provider (LADWP), not the property owner.

Fluorescent light fixtures were observed throughout the building.  Based on the age of construction of the structures (1970s), there is the potential that the fluorescent light fixtures contain PCB-containing ballasts.  The fluorescent light fixtures observed appeared to be in good condition and Gannett Fleming does not consider the presence of fluorescent light fixtures at the Site an environmental concern.

### 5.3.15 Monitoring Wells and Soil Borings

Gannett Fleming observed no monitoring wells or evidence of previous soil borings.

### 5.3.16 Spills/Releases

Gannett Fleming observed no evidence of spills or releases at the Site.

### 5.3.17 Surface Debris

Gannett Fleming observed no significant debris during the site reconnaissance, with the exception of the remnant items associated with the previous grocery store tenant including shopping carts, storage racks, a ladder, vending machines, and a variety of household products.  Several refuse debris piles were observed throughout the Site, including tires, wood pallets and wood panels.

### 5.3.18 Hydraulic Equipment

Gannett Fleming observed no hydraulic equipment during the site reconnaissance.

### 5.3.19 Air Compressor Usage

Gannett Fleming observed no air compressor usage during the site reconnaissance.

### 5.3.20 Asbestos-Containing Materials (ACMs)

Given the age of the structure (prior to the USEPA ban in 1989) Gannett Fleming considers ACMs likely to be present in the building materials at the Site.  Gannett Fleming recommends performing an asbestos



and abatement survey prior to any demolition activities with the potential to disturb the materials on the building.

**5.3.21 Waste Disposal**

Gannett Fleming did not observe any evidence waste disposal during the site reconnaissance.

**5.3.22 Wastewater Discharges**

The Site did not actively produce industrial wastewater; however, former operations at the facility utilized a wastewater treatment system.  According to records provided by the City of Los Angeles Bureau of Sanitation, the treatment system is historically associated with washing of equipment, floors, fruits, vegetables, and meats, and is connected to the municipal sewer system via an eight-inch vitrified clay pipe.

**5.3.23 Storm Water Discharges**

Gannett Fleming did not observe storm water drains located on the property.  A concrete drainage swale was observed running north to south located in the alley to the adjacent west of the property.

**5.3.24 Utilities**

Utilities are not currently being provided to the Site due to its current vacant status.



## 6.0 LIMITED PHASE II ENVIRONMENTAL SITE ASSESSMENT

On October 24, 2013, Gannett Fleming conducted a limited Phase II ESA consisting of 10 soil vapor borings (GFV-1 through GSFV-10; Figure 3). The soil vapor investigation was performed in accordance with the Joint 2012 DTSC/RWQCB Advisory for Conducting Active Soil Gas Surveys (DTSC, 2012). The purpose of the limited Phase II ESA was to screen the shallow soil for the presence of PCE impacts.

### 6.1 Field Activities

### 6.1.2 Pre-Drilling Activities

USA Notification and Marking: In accordance with State of California requirements, Underground Services Alert (USA) was notified 48 hours in advance to mark the location of public utilities prior to conducting field activities. Utility markings were inspected before advancing the borings to ensure locations were not situated in close proximity to potential underground utilities.

A geophysical survey was conducted by Pacific Coast Locators (PCL) to clear the six exterior boring locations from possible underground utilities. PCL utilized advanced ground penetrating radar (GPR) and metal detection devices to mark out underground utilities. Boring locations were adjusted based on the underground utility findings from the geophysical survey.

A Site-specific health and safety plan (HASP) was prepared for the Site, in accordance with Federal regulations (OSHA). Work was conducted within the guidelines of the approved HASP and under the supervision of a California-registered professional geologist.

### 6.1.3 Soil Vapor Survey

J & H Drilling Co., Inc. (J & H) personnel advanced 10 soil vapor borings across the Site, with the exterior boring locations drilled to a depth of 5 feet bgs (with probes installed at 5 feet bgs), and the interior locations drilled to a depth of 8 feet bgs (with probes installed at 8 feet bgs) by means of a limited access dolly-mounted Geoprobe® 6600 drill rig. Each completed soil vapor location was left to equilibrate for a minimum of two hours prior to sampling. Samples were collected by actively withdrawing vapor from the borings. Vacuum integrity of the sampling system was tested prior to and after the soil vapor sampling using leak-down testing methods. Site-specific boring purging and sample volume calibrations were initially performed to evaluate the appropriate volume of gas to be purged from each boring prior to sample collection. One, three and ten purge volumes were analyzed to make this determination.

The sampling rate was approximately 200 cubic centimeters per minute (cc/min) using a glass syringe equipped with Teflon plungers. Ten purge volumes were used for all of the vapor probes, since this purging level gave the highest concentrations for the compound(s) detected. After purging, soil vapor samples were withdrawn from the sample location using a glass gas-tight syringe. A tracer gas, isopropanol (IPA), was placed at the tubing-surface interface before sampling. This tracer gas was



analyzed during the 8260B analytical run to determine if there were surface leaks into the subsurface due to improper installation of the probe. No IPA was detected in any of the samples reported.

Soil vapor samples were analyzed by an on-Site mobile analytical laboratory, A & R Laboratories, for VOCs using USEPA Method 8260B.

## 6.2 Analytical Results

The analytical results for the soil vapor samples detected concentrations of PCE ranging from 0.64 micrograms per liter (μg/L) at sample location GFV6 (the southernmost soil vapor sampling location) up to 45 μg/L at sample location GFV3 (Table 1; Figure 3; Appendix M). At all of the sample locations, PCE was detected above the laboratory reporting limit, with two of the detected concentrations exceeding the California Human Health Screening Levels (CHHSLs) for the residential land use scenario, and the other nine detected PCE concentrations exceeding CHHSLs for the commercial/industrial land use scenario. Other VOCs detected in soil vapor include ethylbenzene, toluene, and xylenes, which were detected at concentrations below their respective CHHSLs. No other VOCs were detected above laboratory method detection limits.

Based on the results of the soil vapor screening conducted on October 24, 2013, there is an apparent north-south gradient of PCE concentrations in soil vapor beneath the Site (Figure 3), indicating a strong likelihood that the adjacent dry cleaner facility to the north is the source of PCE-impacted soil vapor at the Site. PCE impacts in soil vapor at the Site have not been fully delineated, and additional sampling appears to be warranted at the Site in order to further define the lateral and vertical extent of the PCE plume in the subsurface.



## 7.0 INTERVIEWS

### 7.1 Interviews with Property Owner/Occupants

On October 30, 2013, Ms. Rosa Estrada, owner of the 1355 North Avalon Boulevard property completed an owner/occupant questionnaire to answer questions regarding the history of the property (Appendix D). Ms. Estrada's knowledge of the Site extends back to approximately 1988. According to Ms. Estrada, the Site is currently vacant, and was previously used as a grocery market, with former occupants including Acapulco Market from 1988 to 2007 and most recently One Stop Discount Store up until 2012. Ms. Estrada also mentioned that she was aware that the adjoining properties were occupied by a dry cleaner facility. The questionnaire did not identify any new information that has not been already addressed within this report.

An attempt was made to obtain a completed owner-occupant questionnaire from the owners of the 1363 and 1367 properties; however, at the time of this report, Gannett Fleming has not received a completed owner-occupant questionnaire pertaining to either of the properties.

### 7.2 Interviews with Knowledgeable Parties

As discussed in the previous section, Gannett Fleming obtained information from Ms. Estrada through her responses to an owner/occupant questionnaire (summarized above). During the site reconnaissance performed on October 24, 2013, Gannett Fleming met with Mr. Rick Gonzales and Mr. David Baeza of Prudential California Realty (representatives of the current owner of the 1355 North Avalon Boulevard property). They were able to answer questions regarding the history of the Site, and informed Gannett Fleming that the current grocery store structure was constructed in 1954, and has been vacant since 2012. Additionally, Mr. Gonzalez and Mr. Baeza believed the dry cleaner had not been operational for the past five years. The owner of the former dry cleaner property was not available for interview. However, based on the information obtained during the course of this investigation, Gannett Fleming does not believe performing any additional interviews with other parties would provide any additional information that would alter the conclusions of this report.

### 7.3 Interviews with Regulatory Agency Personnel

Gannett Fleming staff did not identify previous regulatory correspondence regarding environmental cleanups for the Site, nor did the agencies contacted have records pertaining to the Site. No relevant regulatory agency personnel were identified for interview regarding this investigation, with the exception of the following:

- ***Mr. Yue Rong – LARWQCB (November 6, 2013):*** Gannett Fleming contacted LARWQCB to inquire about previous reports that the agency may possess pertaining to the former dry cleaner facility



located at 1367 North Avalon Boulevard.   Mr. Rong instructed Gannett Fleming to utilize the formal records request procedure to obtain such information.



## 8.0 FINDINGS, OPINIONS AND CONCLUSIONS

Gannett Fleming performed this Phase I ESA in conformance with the scope and limitations of ASTM Practice E 1527-05 of the property located at properties located at 1355, 1363 and 1367 North Avalon Boulevard in Wilmington (City of Los Angeles), California (Figure 1).  Any exceptions to, or deletions from, this practice are described in Sections 1.3 and 5.1 of this Phase I ESA report. In addition, Gannett Fleming performed a Phase II subsurface investigation to assess VOCs in soil vapor.

### 8.1 Summary of Findings

#### 8.1.1 Site History

The first use of the Site appears to be residential in nature, with the 1928 historical aerial photograph of the Site showing a residential structure in the northern portion of the Site.  Building permit records for the Site maintained by LADBS date back to 1948, with new construction occurring at the Site in 1952, 1954, 1956 and 1962.  According to Mr. Rick Gonzales and Mr. David Baeza of Prudential California Realty (representatives of the current owner of the 1355 North Avalon Boulevard property), the current grocery store structure was constructed in 1954, which appears to be consistent with permit records obtained from LADBS.  Permit records obtained from the City of Los Angeles Sanitation Department indicate the 1355 North Avalon Boulevard property was occupied by a Safeway Super Market in 1955.  An historical aerial photograph from 1956 depicts the Site being utilized for commercial use and in resemblance to its current configuration.  The city directory abstract indicates the 1355 North Avalon Boulevard was formerly occupied by Pic-N-Save (grocery store) from approximately 1975 to 1985, by Acapulco Market from approximately 1985 to 2008, and most recently by One-Stop Discount Store from approximately 2008 to 2012.  The city directory abstract provided by EDR indicates the 1363 North Avalon Boulevard property was formerly occupied by Farmers Insurance Group (1950) and by the most recent tenant La Perla Bakery as early as 1980.  The 1367 North Avalon Boulevard property was utilized for residential use as early as 1950, and was later occupied by Montgomery Dry Cleaners as early as 1954, according to the city directory abstract provided by EDR.  At the time of the site reconnaissance, the onsite structures were observed to be vacant.

#### 8.1.2 Site Reconnaissance

The onsite vacant structure consisted predominantly of linoleum floor tiles with the walls comprising of gypsum board and the ceilings composed of drop-down ceiling tile. Fluorescent light fixtures were observed throughout the building.  The interior of the building was observed to be predominantly vacant, with the northeast corner of the building formerly occupied by Tia's Tacos restaurant, and the remainder of the structure utilized as a grocery store, One-Stop Discount Mart.  A wash area and a water treatment system including three aboveground storage tanks were observed in a small room in the northwest corner of the building.  The eastern portion of the building consists of an inventory storage area and restroom facilities.  Floor drains associated with the sinks were observed in the former kitchen area as



well as in the wash area/water treatment room.  A 55-gallon drum with unknown contents was observed near the front entrance of the building on the northern portion of the property.  Remnants of the former tenants were observed throughout the interior of the building, which included shopping carts, various household products, storage racks, and vending machines.

The remainder of the Site is comprised of a rear storage yard on the southern portion of the property, as well as asphalt-paved parking areas on the northern and western sides of the Site. Three pole-mounted transformers were observed on the southwest corner of the rear storage area.  A 55-gallon drum was observed on the southeast corner of the Site in the rear storage yard area, with the affixed labels indicating that it contains grease produced by the former onsite restaurant.  An adjacent dry cleaner, Montgomery Cleaners, was observed to the adjacent north of the Site.  All features observed are labeled and depicted in Figure 2.

Gannett Fleming identified no environmental concerns or evidence of recognized environmental conditions (RECs) in connection with site reconnaissance with the exception of the adjacent dry cleaner facility to the north.  The soil vapor survey conducted on October 24, 2013 targeted potential soil vapor impacts at the Site associated with the adjacent dry cleaner; the results of the investigation are provided in section 6.0 of this report.

### 8.1.3 Regulatory Agency Records

The Site was listed on the databases reported by EDR including Drycleaners and the EDR US Historical Cleaners databases.  These listings are associated with the former onsite dry cleaner (Montgomery Cleaners) that operated at the Site from approximately 1950 to 2008.

None of the local or regional regulatory cleanup oversight agencies contacted during the course of this Phase I ESA have been involved with investigation, environmental compliance and/or cleanup activities associated with the address of the Site.

Permit records obtained from the Los Angeles Department of Sanitation (LADS) pertain to the operation of a waste water treatment system which was historically utilized for washing of equipment, floors, fruits, vegetables, and meats, and is connected to the municipal sewer system via an eight-inch vitrified clay pipe.  The summary report provided by LADBS shows building permit records for the Site maintained by LADBS date back to 1948, with new construction occurring at the Site in 1952, 1954, 1956 and 1962.

### 8.1.4 Previous Environmental Reports

One previous report was provided by SJB, which consisted of a Phase II Site Investigation Report that was produced in January 2013.  The investigation included 11 soil vapor borings to 5 feet bgs across the properties located at 1355, and 1363-1367 North Avalon Boulevard.  Results of the laboratory analysis of the vapor samples indicated that shallow soil vapor beneath the Site is impacted with PCE at concentrations that exceed regulatory screening levels, with the generally highest concentrations in the



vicinity of the former dry cleaning suite.   Methane was not detected in soil vapor samples; however, since the property is located within a Methane Hazard Zone designated by the City of Los Angeles, it is subject to the requirements of the City's Methane Ordinance, and any renovation of the Property will need to consider the provisions of that ordinance.

### 8.1.5. Interviews

Ms. Rosa Estrada, owner of the 1355 North Avalon Boulevard property, completed an owner/occupant questionnaire to provide any knowledge of historical or current environmental conditions or uses that could adversely impact the Site with chemical or hazardous materials. Ms. Estrada was unaware of any previous spills, accidents, or incidents at the former One-Stop Discount Market property that could have adversely impacted the Site.   No environmental concerns were identified during the interview. Additionally, Gannett Fleming obtained information regarding site history and previous tenants from Mr. Rick Gonzales and Mr. David Baeza of Prudential California Realty (representatives of the current owner of the 1355 North Avalon Boulevard property).  An attempt was made to speak with Mr. Yue Rong at LARWQCB regarding agency records pertaining to the former onsite dry cleaner, Montgomery Cleaners, however he could not provide any knowledge beyond what is discussed in this report.

### 8.1.6. Limited Phase II Environmental Site Assessment

On October 24, 2013, Gannett Fleming conducted a Phase II subsurface investigation to test for VOCs in soil vapor.  The investigation consisted of advancing 10 soil vapor borings across the 1355 North Avalon Boulevard property.  Borings advanced on the interior of the former One-Stop Discount Market were advanced to 8.0 feet bgs while the exterior boring locations were advanced to 5.0 feet bgs.  Vapor samples were collected and analyzed for VOCs.  Results of the laboratory analysis indicated shallow soil vapor at the Site is impacted with PCE at concentrations that exceed regulatory screening levels, with the highest concentrations generally found in the vicinity of the former dry cleaning suite.

### 8.2 Data Failures, Data Gaps, and Other Opinions

Through the course of this assessment, Gannett Fleming may have encountered data failures or data gaps.  These failures or gaps, if any, are discussed below. The following provides the opinion of the EP as to the significance of the data gaps in terms of defining recognized environmental conditions at the Site. Data failures may or may not be significant data gaps, and the discussion also provides information pertaining to whether the data failures resulted in significant data gaps.

### 8.2.1 Data Failures

Data failure is a failure to achieve the historical (property use) research objectives specified in the ASTM Standard Practice even after reviewing the eight standard historical sources that are reasonably ascertainable and likely to be useful. Data failure is one type of data gap (see Section 7.2.2).



Gannett Fleming identified no data failures during the course of this Phase I & Phase II ESA.

### 8.2.2 Data Gaps

A data gap is a lack of or inability to obtain information required by the ASTM Standard Practice, despite good faith efforts by the EP to gather such information. This could include any component of the Practice, e.g., standard environmental records, interviews, or a complete reconnaissance. A data gap by itself is not inherently significant, but if other information and/or the EP's experience raise reasonable concerns about the gap, it may be judged to be significant.

- Gannett Fleming was not permitted access to the properties located at 1363 and 1367 North Avalon Boulevard for the site reconnaissance or the Phase II site investigation.  Given that these suites are known to be vacant, it is not considered a significant data gap that Gannett Fleming was not permitted access to these properties.  However, it should be noted that the Phase II site investigation was limited to the 1355 North Avalon Boulevard property, and thus does not serve to characterize the shallow vapor conditions beneath the remaining portions of the Site located at 1363 and 1367 North Avalon Boulevard.

- Due to time and cost constraints, Gannett Fleming was unable to view building permit records maintained by LADBS.  Given the known data about the environmental conditions at the Site and the unlikeliness that any records received from the agency would alter the conditions or recommendations of this report, this data gap is not considered significant.

### 8.3 Conclusions

RECs, as defined by ASTM E 1527-05, include the presence or likely presence of any hazardous substances or petroleum products on a property under conditions that indicate an existing release, past release, or a material threat of a release into structures on the property, or into the ground, ground water, or surface water of the property. Historical RECs include environmental conditions which in the past would have been considered a REC, but which may or may not be considered a REC currently. These terms are not meant to include *de minimis* conditions that generally do not present a material risk of harm to public health or the environment and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies.

### 8.3.1 RECs

Based on our review of available local, state, and federal environmental records, personal interviews conducted with knowledgeable parties, and a site reconnaissance, this assessment has revealed no evidence of recognized environmental conditions in connection with the Site, except for the following:

- The previous Phase II site investigation conducted by SCS Engineers in January 2013 as well as the Phase II ESA conducted at the Site by Gannett Fleming in October 2013 demonstrate that soil



vapor beneath the Site is impacted by PCE at concentrations that exceed regulatory screening levels for residential and commercial land use scenarios.  PCE concentrations are generally highest in the vicinity of the former dry cleaner suite located at 1367 North Avalon Boulevard, indicating the former dry cleaner (Montgomery Cleaners) is the likely source of the impacts.  The presence of PCE-impacted soil vapor associated with the former on-site dry cleaner facility is considered a REC and requires further investigation at this time.

### 8.3.2 HRECs

This assessment has revealed no evidence of HRECs in connection with the Site.

### 8.3.3 *De Minimis* Conditions

This assessment has revealed no evidence of *de minimis* conditions in connection with the Site, except for the following:

- Gannett Fleming observed three pole-mounted transformers located at the southern boundary of the Site.  The transformers appeared to be in good condition and no staining or leaking was observed beneath or around the transformers.  The transformers are unlikely to represent an environmental concern to the Site.  In the event that PCB-containing oil leaks from the transformers, the responsibility for cleanup would rest with the utility provider (Los Angeles Department of Water and Power), not the property owner.

- A 55-gallon drum of unidentified contents was observed within the interior of the 1355 building.  No staining or evidence of spillage of hazardous materials was observed in connection with the drum.  Nevertheless, the drum contents should be identified or the drum removed/disposed as a precautionary measure.

### 8.3.4 Non-ASTM Conditions

Gannett Fleming has identified the following non-ASTM environmental issues in connection with the Site:

- Based on the dates of construction, Gannett Fleming opines that ACM may be present at on-site structures.  Therefore, Gannett Fleming recommends performing a pre-demolition asbestos survey prior to any activities with the potential to disturb the materials, and recommends abating any identified ACM in accordance with all applicable laws.  Based on the dates of construction, it is possible that LBP may be present within interior and exterior painted surfaces.  Gannett Fleming recommends testing and handling these surfaces according to applicable laws and regulations, including guidelines of the Occupational Safety and Health Administration ("OSHA").

- Fluorescent light fixtures were observed at the 1355 North Avalon Boulevard property.  Based on the age of construction of the structures, there is the potential that the fluorescent light fixtures



contain PCB-containing ballasts.  The fluorescent light fixtures observed appeared to be in generally good condition and Gannett Fleming does not consider the presence of fluorescent light fixtures at the Site an environmental concern.  In the event that PCBs are identified to be present within such fixtures, such fixtures should be disposed of by a licensed hazardous waste hauler.

- Methane was not detected in soil vapor samples collected by SCS during the prior soil vapor investigation conducted in January 2013; however, since the property is located within a Methane Hazard Zone designated by the City of Los Angeles, it is subject to the requirements of the City's Methane Ordinance.  Accordingly, the SJB Properties should ensure compliance with the Ordinance to include appropriate methane mitigation measures required in the construction specifications.



## 9.0 REFERENCES

ASTM, 2008. American Society for Testing and Materials (ASTM), November 2005. Standard Practice E1527-05 for Environmental Site Assessments: Phase I Environmental Site Assessment Process.

ASTM, 2010. Standard Guide for Vapor Encroachment Screening on Property Involved in Real Estate Transactions. ASTM E2600-10.

DTSC, 2012. Advisory Active Soil Gas Investigations. April 2012.

Environmental Data Resources (EDR) 2013.EDR Radius Map with Geocheck. Inquiry number 3768624.2s October 28, 2013.

EDR 2013.EDR Aerial Photo Decade Package. Inquiry number 3768624.5 October 30, 2013.

EDR 2013.EDR City Directory Abstract. Inquiry number 3768624.6 October 28, 2013.

EDR 2013.EDR Environmental Lien. Inquiry number 3768624.7 October 29, 2013.

EDR 2013.EDR Historical Topographic Map Report. Inquiry number 3768624.4 October 29, 2013.

EDR 2013.EDR Property Tax Map Report. Inquiry number 3768624.8 October 28, 2013.

EDR 2013.EDR Sanborn Map Report. Inquiry number 3768624.3 October 28, 2013.

Office of Environmental Health Hazard Assessment (OEHHA) 2010. Soil-Gas-Screening Numbers for Volatile Chemicals Below Buildings Constructed with Engineered Fill Below Sub-Slab Gravel.

SCS Engineers (SCS) 2013.Phase II Site Investigation Report 1355 and 1363-1367 North Avalon Boulevard, Wilmington, California 90744. Dated January 2013.



**FIGURES**



**TABLES**



**APPENDICES**



**APPENDIX A**
**PROFESSIONAL QUALIFICATIONS**



**APPENDIX B**
**EDR – TAX MAP REPORT**



**APPENDIX C**
**EDR – ENVIRONMENTAL LIEN SEARCH**



**APPENDIX D**
**OWNER/OCCUPANT AND USER QUESTIONNAIRES**

**APPENDIX E**
**EDR – RADIUS MAP WITH GEOCHECK® REPORT**



**APPENDIX F**
**EDR – SANBORN® MAP REPORT**

*Gannett Fleming*

**APPENDIX G**
**EDR – AERIAL PHOTO DECADE PACKAGE**



**APPENDIX H**
**EDR – HISTORICAL TOPOGRAPHIC MAP REPORT**



**APPENDIX I**
**EDR - CITY DIRECTORY ABSTRACT**



**APPENDIX J**
**REGULATORY AGENCY CORRESPONDENCE**



**APPENDIX K**
**PREVIOUS ENVIRONMENTAL REPORTS**



**APPENDIX L**
**PHOTOGRAPHIC LOG**

**APPENDIX M**
**LABORATORY ANALYTICAL RESULTS**

